Dorna F. KERR, et al., Plaintiffs–Appellants,

v.

CITY OF WEST PALM BEACH, et al., Defendants–Appellees.

No. 87–5837.

United States Court of Appeals, Eleventh Circuit.

June 27, 1989.

James K. Green, West Palm Beach, Fla., Randall C. Berg, Jr., Florida Justice Institute, Inc., Peter M. Siegel, Miami, Fla., for plaintiffs-appellants.

Alberto A. Macia, Shea & Gold, Miami, Fla., for defendants-appellees.

Before TJOFLAT and EDMONDSON, Circuit Judges, and GIBSON *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

## I.

In this case, individuals[1] brought suit against the City of West Palm Beach, its former chief of police,[2] and two police officers.[3] The plaintiffs alleged that they had suffered serious injuries as a result of their

---

\* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. These individuals were Dorna F. Kerr, on behalf of her minor son Uwaine; Jimmy Jerome Arnold; Cherry Black, on behalf of her son Marcel; Richard Granison; and Josh Terrell. Ms. Black's claim was severed prior to trial, and it is not before us.

2. John H. Jamason was chief of the West Palm Beach Police Department from April 1980 to October 1984—the period in which the incidents giving rise to plaintiffs' complaint occurred.

3. The two officers were Michael J. Pontieri and Jerry Chestnut, both of whom were members of the West Palm Beach Police Department's canine unit at the time of the incidents giving rise to plaintiffs' complaint.

   Plaintiffs also named as defendants George Siegrist, individually and in his capacity as current Chief of the West Palm Beach Police Department, and Dwight Baber, in his capacity as Mayor of the City of West Palm Beach. Upon stipulation, plaintiffs voluntarily dismissed their claims against these defendants prior to trial.

apprehension by dogs in the West Palm Beach Police Department's canine unit. Plaintiffs claimed that the Department's canine unit had used excessive force in their apprehension, in violation of the fourth and fourteenth amendments to the United States Constitution;[4] they therefore sought compensatory and punitive damages pursuant to 42 U.S.C. § 1983 (1982) on behalf of themselves and a class of similarly situated individuals. The plaintiffs further contended that the policies of the West Palm Beach Police Department's canine unit were unconstitutional *per se*, in violation of the principles governing the constitutional use of force announced by the Supreme Court in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); the plaintiffs therefore asked the court to declare the City's policies regulating the use of the canine unit unconstitutional, and to enjoin the Department from continuing to use its canine unit in an unconstitutional manner.

**4.** The fourth amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." By its own terms, the fourth amendment protects the citizenry only against unlawful actions by federal officials; the due process clause of the fourteenth amendment to the Constitution, however, incorporates the guarantees of the fourth amendment with regard to unlawful actions by state and municipal actors. *See Wolf v. Colorado,* 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949).

**5.** The jury, whose verdict was in the form of answers to special interrogatories, found against plaintiff Richard Granison, and his claim is not before us. The jury's verdict with respect to the three remaining plaintiffs was as follows:

    1. Was Defendant Officer Jerry Chestnut justified in permitting his dog to bite Plaintiff Uwaine Kerr?
    Yes___ No_X_
    2. Was Defendant Officer Michael Pontieri justified in permitting his dog to bite Plaintiff Josh Terrell?
    Yes_X_ No___
    3. Did Defendant Officer Michael Pontieri use unreasonable force in apprehending Plaintiff Josh Terrell?
    Yes_X_ No___
    4. Was Defendant Officer Michael Pontieri justified in permitting his dog to bite Plaintiff Jimmy Jerome Arnold?

The district court refused to certify a class, and bifurcated the trial of plaintiffs' individual claims into liability and damages phases. After a trial on the issue of liability, the jury returned a verdict for three of the plaintiffs against the police officers, concluding that the officers had used excessive force in the plaintiffs' apprehension.[5] The plaintiffs and the defendant police officers thereafter settled these claims.

The jury also found against the City of West Palm Beach and its former police chief, concluding that they had inadequately trained and supervised the canine unit and "encouraged an atmosphere of lawlessness" out of which the plaintiffs' injuries arose.[6] After the jury returned its verdict, the City and its former police chief moved the court for judgment n.o.v. The district court granted their motion, concluding that the plaintiffs had not met the heavy burden of establishing municipal liability under section 1983. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 690–95, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978).

    Yes___ No___
    5. Did Defendant Officer Michael Pontieri use unreasonable force in apprehending Plaintiff Jimmy Jerome Arnold?
    Yes_X_ No___
Because the jury was not able to reach a decision as to question 4, the court found for Jimmy Jerome Arnold on the basis of the jury's response to question 5.

**6.** The jury's verdict was as follows:
    8. Was there a failure on the part of Defendant Chief Jamason to have the police dogs or their handlers adequately trained or supervised?
    Yes_X_ No___
    9. Was there a failure on the part of the Defendant City of West Palm Beach to have the police dogs or their handlers adequately trained or supervised?
    Yes_X_ No___
    10. Was there a failure on the part of Defendant Chief Jamason which encouraged an atmosphere of lawlessness on the part of the Defendant Officers?
    Yes_X_ No___
    11. Was there a failure on the part of Defendant City of West Palm Beach which encouraged an atmosphere of lawlessness on the part of the Defendant Officers?
    Yes_X_ No___
The record on appeal fails to reveal whether any party objected to the somewhat unusual language of this verdict.

With regard to the plaintiffs' prayer for declaratory and injunctive relief, the court refused to enjoin the Department's continued use of its canine unit in the apprehension of suspects, concluding that the use of such force was not unconstitutional *per se* under the principles announced by the Supreme Court in *Garner.* In this appeal, the plaintiffs challenge the district court's denial of declaratory and injunctive relief, the court's granting of judgment n.o.v. in favor of the City of West Palm Beach and its former chief of police, and the court's refusal to certify a class.[7] We address these points after reviewing the facts established at trial.

## II.

Appellants maintain that the evidence they presented to the jury established that appellees, the City of West Palm Beach and its former chief of police, sanctioned the excessive force used by the defendant police officers; hence, appellants argue, the district court erred in granting appellees judgment n.o.v. In determining whether the court erred, we examine the facts in the light most favorable to appellants. *See, e.g., Johnson v. Bryant,* 671 F.2d 1276, 1279 (11th Cir.1982) (In reviewing ruling on motion for judgment n.o.v., court must consider evidence in light most favorable to party opposing the motion.).[8]

In 1981, the West Palm Beach Police Department established a canine unit to aid in the apprehension of fleeing or concealed suspects. To train the unit, the City sent the chosen officers and newly purchased German Shepherd dogs to a twelve-week, 480 hour course in basic obedience and police work. At the time of the incidents involving appellants, the canine unit included two German Shepherd dogs, "Sultan" and "Nick," and their handlers, Police Officers Michael J. Pontieri and Jerry Chestnut.

The written policies of the West Palm Beach Police Department provided that the canine unit would be employed as follows:

I. Background: Due to the rising number of burglaries, building alarms, and suspects fleeing on foot or hiding, the K–9 Unit has been formed to effect a faster, safer, and more efficient way to handle these searches. The following Order is enacted so that the officers involved in a K–9 Unit-assisted-search will understand their responsibilities, and maximum effectiveness through a well coordinated effort can be achieved.

. . . .

III. Operational guidelines for the K–9 Unit:

A. When force should be used by the K–9 unit:

1. In protection of the handler or other Officers.

2. Fleeing felony suspects after refusing to stop.

3. Hiding felony suspects that refuse to come out.

4. Hiding felony suspects that are not visible to the handler.

5. When the dog is being assaulted.

. . . .

E. In general, searches shall commence, if the suspect does not surrender or halt after being challenged. The K–9 handler will use the method he feels will be most effective and productive.

---

7. Appellants also challenge several evidentiary rulings by which the district court refused to admit certain police reports and photographs. Our disposition of this appeal makes these evidentiary questions moot; accordingly, we do not address them. *But see* discussion *supra* note 19.

8. Appellants also contend that the district court erred in denying them declaratory and injunctive relief. As explained *infra* at III, the court's denial was correct because appellants lacked standing to seek such relief. Were we to reach the merits of this claim, however, we would have to examine the facts not in the light most favorable to the appellants, but rather in the light most favorable to the appellees—in whose favor the district court found, sitting as an independent trier of fact in equity. Moreover, our focus would not be on the policies of the City of West Palm Beach at the time the plaintiffs were apprehended by the municipality's canine unit, but instead on the policies of the City at the time appellants submitted their case for equitable relief to the court for decision.

F. When force is used by the K–9 unit, it will be handled in the same manner as other uses of force by Officers.

1. The suspects' injuries will be photographed, in color and black and white, when the dog has bitten the suspect.

2. All suspects that have been bitten by the dog[ ] will be taken to the nearest hospital for treatment.

3. The shift commander will be notified of the incident by the K–9 handler. The shift commander, before his tour of duty ends, will prepare an investigative letter directed to the Patrol Captain and detailing the force used.

City of West Palm Beach, Police Procedure Order # K–9 (February 17, 1981). Testimony at trial established that in assessing whether to use canine force, an officer did not need to have probable cause to believe that the suspect committed a felony; instead, a "reasonable suspicion" was sufficient.

Significantly, undisputed testimony at trial revealed that the West Palm Beach Police Department also had an oral policy allowing officers to use the canine unit to apprehend fleeing and concealed individuals suspected of a "serious misdemeanor." This oral policy did not define what constituted a serious misdemeanor, relying instead on the individual officer's discretion in making this determination. The evidence established that the accepted scope of a serious misdemeanor was very broad, encompassing violations of city ordinances as well as Florida statutes. Thus, the canine unit was used to apprehend fleeing or concealed individuals suspected of prowling, of drunkenness, of petty larceny, of prostitution, of traffic offenses—even individuals whose only offense was being in a city park after hours. In fact, since disobeying the command of an officer was itself a misdemeanor, testimony revealed that under the Department's policy, an officer, in his discretion, could use canine force to apprehend *any* suspect that continued to flee after being ordered to stop.

Dogs in the canine unit were trained to "bite and hold" a suspect. This method of training is employed by many other police departments throughout the country. The distinctive aspect of this training method is its aggressive nature: unless the handler countermands his order, the dog will seek to seize a suspect even if that individual complies with the officer's orders. Thus, injury to the apprehended suspect is often inevitable.

Under the bite and hold method of training, a dog seeks to subdue a suspect by biting his arm or leg; if, however, the dog has no access to such an appendage, the dog will bite the suspect on any available area of his body. Upon being bitten by a dog, a suspect usually attempts to free himself; the dog, however, is trained to maintain his hold on the suspect until ordered to release the suspect by its handler. Thus, if the dog should lose his hold as a result of the suspect's attempts to free himself, the dog will seek to reestablish it. As a result, suspects often suffer serious injury from multiple bites received during the course of an apprehension.[9]

The severity of an apprehended suspect's injuries can be reduced if the handler has complete control over the actions of his dog. With such control, the handler can recall or restrain the dog before a bite even occurs. Alternately, the handler can quickly remove the dog from the apprehended suspect, minimizing the possibility that the suspect will be further injured in an ensuing struggle. Since a police dog that is apprehending a fleeing suspect is often far in front of its handler, canine law enforcement training stresses the use of oral commands, which the dog can obey even when its handler is at a distance, rather than "leash" commands, which require the officer to touch the dog or, in some instances, to pull the dog off the suspect. The evidence in this case established that handlers in the West Palm Beach canine unit often had to reinforce their verbal commands by leash commands. In addition, the evidence

9. Under the Police Department's policies, a picture was taken of all bite wounds. Copies of these pictures were informally kept around the police station in a "bite book," which was subsequently destroyed on the advice of the Department's counsel.

established that the canine unit's handlers often used very long leashes—up to thirty feet in length—and that the length of these leashes was blamed by some for the officers' lack of adequate control over their dogs and the resulting high frequency of injury to apprehended suspects.

Because a dog's responsiveness to its handler's commands may erode over time, police dogs need continual training to assure that they will perform responsibly. To ensure that misbehaving dogs receive prompt corrective training, a strict performance monitoring system is necessary. One indication of a misbehaving dog is a high ratio of bites to apprehensions (the bite-ratio). An expert testified concerning the bite-ratio that could be expected from a properly trained and supervised canine unit. That expert indicated that less than thirty percent of apprehensions should, on average, result in a bite. Thus, some police departments require supervisors automatically to review the performance of any canine unit with a bite-ratio of over twenty percent in order to ensure that misbehaving dogs receive prompt corrective training.

With regard to the West Palm Beach canine unit, Officer Pontieri testified that fifty percent of his apprehensions resulted in a bite; Officer Chestnut testified that his dog's bite-ratio was approximately thirty percent. When all the apprehensions made by the canine unit since 1981 were tallied, the unit's overall bite-ratio was about fifty percent. Eighty-five percent of the bites involved individuals suspected of a non-violent felony or misdemeanor.

The Department had no specialized internal procedures for monitoring the performance of the canine unit. Instead, the Department relied on a general system of "force reports," which were prepared by the shift commander upon being notified that an officer had used force to make an apprehension. Under the Department's policy, supervisory personnel—including the chief of police—subsequently reviewed each report to establish that excessive force had not been applied. The force reports were not compiled to keep track of the acceptability of the performance of individual dogs in the canine unit, and were usually discarded after thirty days.[10] The force reports, therefore, were not an effective mechanism for ensuring that misbehaving dogs would be withdrawn from use or given corrective training.

Expert testimony also established that an excessive number of citizen complaints often serve to notify a police department that a particular dog has been misbehaving. Thus, some departments require a review of a canine unit's performance upon receipt of three complaints of any type within a one-year period. The West Palm Beach Police Department had no such procedural mechanisms to review the performance of handlers and dogs whose actions had resulted in an excessive number of complaints.

Several specific apprehensions involving the use of the Department's canine unit formed the basis for appellants' complaint in this case. In three of these incidents, the jury found that officers in the unit used excessive force.[11] As such a finding was an essential precondition to municipal liability, we briefly describe the circumstances surrounding these apprehensions.

In the early morning of July 7, 1982, Josh Terrell fell asleep in the front yard of a West Palm Beach home. He was drunk. The sound of police activity and barking subsequently awakened him, and he moved to some bushes at the side of the house, where he again laid down. The police activity was in response to a burglary in the neighborhood. Because the police believed that the suspect might still be in the vicinity, the officers called in Officer Pontieri and his dog, Sultan, to search the area. Sultan picked up a scent and led Pontieri to the side yard of a house, where the dog alerted on Terrell, who was asleep in the

---

**10.** In addition to the force reports, each handler kept a private daily record of whether his dog was acting acceptably. The Department, however, did not monitor these records.

**11.** *See supra* note 5 and accompanying text.

bushes. Pontieri told Sultan to "Get 'em," and the dog attacked Terrell, locking onto his arm. Pontieri told the dog to pull back, at which command the dog began to drag Terrell out of the bushes. In so doing, the dog reestablished its grip, biting Terrell again in the arm. Once Terrell was in the open, Pontieri ordered Sultan to release Terrell, who was screaming in pain. Terrell then got up and moved toward Pontieri, who knocked him to the ground by hitting Terrell on the head with a flashlight. Pontieri then handcuffed Terrell, at which point Terrell was again bitten, this time on the thigh. Terrell was then taken to Good Samaritan Hospital, where his wounds were treated. Terrell was not, in fact, the individual the police suspected as having committed the burglary.

In the early morning of November 24, 1982, Jimmy Jerome Arnold stole some fishing rods and reels sticking out of the window of a parked automobile. After doing so, he heard what he thought was a police car, and he began to run. Eventually, Arnold attempted to hide from the pursuing officers by climbing a tree that was in a small yard off of an alleyway. The police brought in Officer Pontieri and his dog, Sultan, and they eventually located Arnold in the tree, about six feet above the ground. Pontieri told Arnold to come down; when Arnold did not respond, Pontieri grabbed Arnold's leg and pulled him out of the tree. Arnold fell and was seized by Pontieri, who forced him onto his stomach. Pontieri then released Arnold, who remained spread-eagle on the ground. At this point, Sultan attacked Arnold, locking onto his arm. Arnold screamed, asking Pontieri to call off the dog. Eventually, Pontieri ordered the dog to release Arnold's arm; the dog, however, failed to obey, releasing Arnold only after Pontieri hit the dog over the head with a flashlight. Arnold was then taken to Good Samaritan Hospital, where he was treated for multiple bite wounds. Arnold was charged with stealing the fishing equipment; he pled guilty and served two years in prison.

On the night of July 14, 1984, Uwaine Kerr was walking through Currie Park in West Palm Beach. As he passed by an old boathouse, Kerr was observed by Officer Chestnut, who was patrolling the park in his police car. Chestnut shone his car's searchlight on Kerr, who froze and then attempted to hide in some bushes surrounding the boathouse. Accompanied by his dog Nick, Chestnut got out of the car and ordered Kerr to come out; Kerr panicked and began running. After running out of the park and onto Flagler Avenue, Kerr evidently believed that he had eluded his pursuers and he paused to urinate against a building. At that point, Kerr heard someone behind him say, "Stick him"; Nick then attacked Kerr, throwing him down onto the ground. As a result of the attack, Kerr suffered wounds on the upper thighs of both legs. Kerr was subsequently handcuffed and taken to a nearby hospital for treatment. No charges were filed against Kerr.

Having set forth the facts established at trial, we examine appellants' first assignment of error: that the district court erred in refusing to grant their prayer for injunctive and declaratory relief.

### III.

Appellants maintain that the evidence in this case clearly established that the West Palm Beach Police Department's canine policy was unconstitutional under *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Appellants contend that the district court erred in concluding otherwise, and therefore should have granted their petition for declaratory and injunctive relief against the Department's continued adherence to the policy. We do not reach the merits of appellants' argument, concluding that they have no standing to request declaratory and injunctive relief against appellees. We thus affirm the district court's denial of such relief, but on different grounds.

In asserting their claim for declaratory and injunctive relief, appellants rely on the Supreme Court's decision in *Garner*. In that case, the police were called to investigate the suspected burglary of a residence. Upon arriving at the house, an officer spot-

ted a youth running out the back door. The youth proceeded to stop at the base of a high fence at the edge of the yard. The officer ordered the youth to stop; the youth, however, began to climb the fence. The officer then shot at the youth to prevent him from evading arrest. The youth was struck in the head by the bullet and subsequently died. The officer's action was in accord with the common law rule regarding the use of force against escaping felons, which Tennessee had codified as follows: "If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest." Tenn. Code Ann. § 40-7-108 (1982), *quoted in Garner*, 471 U.S. at 4, 105 S.Ct. at 1698.

The youth's father brought an action under 42 U.S.C. § 1983 (1982), claiming that in apprehending his son, the officer used unreasonable force in violation of the fourth and fourteenth amendments to the United States Constitution. The Supreme Court rejected the state's contention that the fourth amendment embodied the common law rule regarding escaping felons, *see id.* at 12-20, 105 S.Ct. 1701-06, and instead applied a balancing approach. The Court weighed "[t]he suspect's fundamental interest in his own life" against "governmental interests in effective law enforcement," *see id.* at 9, 105 S.Ct. at 1700, and concluded:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. *The Tennessee statute is unconstitutional insofar as it*

> *authorizes the use of deadly force against such fleeing suspects.*

*Id.* at 11, 105 S.Ct. at 1701 (emphasis added). Seizing on this last sentence, the parties urge us to consider the general question of whether the West Palm Beach Police Department's canine policy is constitutional *vel non*.

Looking at that policy, we note that it encompasses a broad range of action. To the extent that the policy authorizes police officers to use canine force against suspects who pose a threat to an arresting officer or to the community, the policy is clearly constitutional under the dictates of *Tennessee v. Garner*. To the extent that the policy allows officers to use canine force against individuals suspected of "serious misdemeanors," the constitutionality of the policy may be less certain. *Garner* itself, however, teaches that we should not consider the constitutionality of municipal policies in the abstract; instead, *Garner* teaches that the federal courts are to focus only on the constitutionality of specific applications of a challenged policy to specific factual circumstances. Thus, in *Garner*, having determined that the "Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects," *id.* at 11, 105 S.Ct. at 1701, the Court went on to state as follows:

> *[The Tennessee statute] is not, however, unconstitutional on its face.* Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. *As applied in such circumstances*, the Tennessee statute would pass constitutional muster.

*Id.* at 11–12, 105 S.Ct. at 1701 (emphasis added). Given this emphasis on the specific circumstances in which a policy is applied, we conclude that *Tennessee v. Garner* does not authorize the federal courts to perform an assessment of the abstract constitutionality of government policies; rather, the only question for the federal courts is whether a particular seizure was constitutional in light of the unique factual circumstances in which the police acted.

Our conclusion that the federal courts should not consider the abstract constitutionality of municipal policies is confirmed by the Supreme Court's analysis of standing in *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983). In that case, Los Angeles police officers stopped Adolph Lyons for a traffic violation. Although Lyons offered no resistance to the officers, they seized him and applied a chokehold that rendered him unconscious and damaged his larynx. Lyons subsequently brought a civil rights action against the officers and the City of Los Angeles, alleging that the officers' action violated his fourth amendment right to be free from unreasonable seizures. Lyons asked the court to award him compensatory damages and to enjoin the City of Los Angeles and its police officers from employing chokeholds in the future. The district court refused to grant such an injunction, concluding that Lyons lacked standing to seek it. After a number of appeals, the dispute eventually reached the Supreme Court on certiorari.[12]

The Supreme Court agreed with the decision of the district court, concluding that Lyons lacked standing to seek injunctive relief. The Court first noted that under Article III of the Constitution, the jurisdiction of federal courts is limited to "actual cases or controversies." To establish such a controversy, a plaintiff "must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 101–02, 103 S.Ct. at 1665 (citations omitted). The Court then concluded:

> In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 105–06, 103 S.Ct. at 1667. To meet this last requirement, the Court noted that municipal approval of its officer's actions would have to be express, "either order[ing] or authoriz[ing] application of the chokeholds where there is no resistance or other provocation." *Id.* at 106 & n. 7, 103 S.Ct. at 1667 & n. 7.

■ Applying the *Lyons* analysis to the facts of this case, appellants have not contended that they will again be unlawfully seized by one of the City's police dogs. In addition, we think it clear that although the Police Department has promulgated a general policy that may *permit* unconstitutional seizures in some circumstances, the Department's policy does not *require* its officers to act unconstitutionally. Under both *Garner* and *Lyons*, such general policies are not unconstitutional on their face; appellants therefore have no standing to seek injunctive or declaratory relief against the policy's continued usage. *See generally Mitchell v. City of Sapulpa*, 857 F.2d 713, 720 (10th Cir.1988) (Plaintiff, who was unlawfully seized pursuant to an Oklahoma statute that ostensibly violated the dictates of *Garner*, had no standing under *Lyons* to seek a declaratory judgment as to the statute's constitutionality.).

---

**12.** The procedural history of the dispute is as follows. The district court refused to issue the injunction for want of standing; the court of appeals reversed and remanded the case, *see Lyons v. City of Los Angeles*, 615 F.2d 1243 (9th Cir.1980); the Supreme Court denied certiorari, *see* 449 U.S. 934, 101 S.Ct. 333, 66 L.Ed.2d 158 (1980). On remand, the district court entered an injunction against the use of chokeholds by the Los Angeles police; the court of appeals affirmed, *see* 656 F.2d 417 (9th Cir.1981); the City appealed, and the Supreme Court granted certiorari, *see* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982).

Although we must affirm the district court's denial of injunctive and declaratory relief, our action does not leave appellants without an adequate legal remedy against the City and its former chief of police.

## IV.

■ In this case, appellants maintain that the district court improperly granted judgment n.o.v. in favor of appellees, the City of West Palm Beach and its former police chief. A trial court may grant a judgment n.o.v. only if, viewing the evidence in the light most favorable to the non-moving party,

> the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.... On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied....

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc) (motion for directed verdict);[13] *Johnson v. Bryant,* 671 F.2d 1276, 1279 (11th Cir.1982) (applying *Shipman* standard to judgments n.o.v.). Having examined the record of this case, we conclude that there was substantial evidence upon which the jury could have found appellees liable for appellants' injuries; the district court therefore erred in entering judgment n.o.v. in favor of appellees.

At trial, appellants contended that the City of West Palm Beach and its former

police chief were liable for two interrelated omissions: first, they failed adequately to train the municipality's canine unit in the constitutional use of canine force; second, appellees failed adequately to supervise the performance of members of the canine unit to ensure that both misbehaving dogs and officers exhibiting bad judgment in the use of canine force received corrective training. We focus on the element common to both claims: the alleged failure to train.

In its recent decision in *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court concluded that in certain circumstances a city may be liable under 42 U.S.C. § 1983 (1982) for its failure to train municipal employees adequately. To establish municipal liability under *City of Canton,* a plaintiff must establish two things: first, that the city in fact inadequately trained its employees in the lawful execution of their duties, *see id.* at ——, 109 S.Ct. at 1205; and second, that this failure to train was actually a city policy. With regard to this second element, the Court concluded that "only where a municipality's failure to train its employees in a relevant respect evidences a *'deliberate indifference'* to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at ——, 109 S.Ct. at 1204–05 (emphasis added).[14] Having set forth the legal standard, we review the relevant evidence in this case.[15]

Following *City of Canton,* we first consider whether the City of West Palm Beach and its former police chief failed to estab-

---

**13.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**14.** In this regard, the Court noted further that: It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can

reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.
*City of Canton,* —— U.S. at ——, 109 S.Ct. at 1205 (footnotes omitted).

**15.** In this opinion we focus on the legal standard as stated by the Supreme Court in *City of Canton;* nevertheless, we note that the law of this circuit was already in substantial accord with the dictates of that decision. *See, e.g., Gilmere v. City of Atlanta,* 774 F.2d 1495, 1503–04 (11th Cir.1985) (en banc), *cert. denied,* 476

lish an adequate program of training for the canine unit. Viewed in the light most favorable to appellants, the evidence established that police dogs must be subject to continual, rigorous training in law enforcement techniques. Such training ensures that the dogs will continue to respond with alacrity to the commands of their handlers; without such training, the dogs' responsiveness to their handlers' commands will deteriorate, resulting in more frequent and more serious injuries to apprehended suspects than might otherwise occur. The evidence further established that officers in the City's canine unit resorted to the use of canine force more frequently than did canine units in other municipalities, and that in other municipalities such high ratios of bites to apprehensions were viewed as an indication of an irresponsible use of force. Finally, the evidence established that officers in the canine unit often used excessive force to apprehend individuals suspected only of minor misdemeanor offenses. From this evidence, we think that a reasonable jury could have concluded that the unit was inadequately trained in the constitutional use of canine force.

Having so concluded, we turn to *City of Canton*'s second question: whether this inadequate training represented city policy. The evidence in this case established that the apprehension of suspects by the City's canine unit frequently resulted in injury to the suspect. The evidence further established that officers in the unit filed force reports whenever the apprehension of a suspect resulted in a bite. These reports were then reviewed by supervisory officials—including the municipality's former chief of police—to whom the City had delegated policymaking authority.[16] In *City of Can-*

*ton,* the Supreme Court recognized that the frequency of constitutional violations may, in itself, provide sufficient circumstantial evidence that a municipality has chosen to allow its officers to act without adequate training. In so stating, the Court gave the following illustration:

> For example, city policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.
>
> It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policy makers, who, nevertheless, are "deliberately indifferent" to the need.

*Id.* at —— n. 10, 109 S.Ct. at 1205 n. 10. After considering the whole of the circumstantial evidence in this case, we believe that a reasonable jury could have so concluded, finding that the unconstitutional character of many of the canine unit's apprehensions was plainly obvious to City officials, who then deliberately chose not to take corrective action.[17]

In this case, however, the jury was also presented with direct evidence that the City was aware of the canine unit's deficiencies. William M. Barnes became the acting chief of the West Palm Beach Police Department

---

U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). Thus, although *City of Canton* was decided well after the jury considered its verdict in this case, we find no flaw in the jury's instructions. In so concluding, we acknowledge that the instructions did use the term "gross negligence" at one point—a term rejected by the Court in *City of Canton. See City of Canton,* —— U.S. at —— & n. 7, 109 S.Ct. at 1204 & n. 7. The instructions, however, when viewed as a whole clearly emphasized the "deliberate indifference" standard adopted by the Court.

**16.** In appellees' brief, they admit that "substantial evidence [ ] showed that both the City and Chief Jamason had been fully apprised of all canine unit activities. Pursuant to a police department internal order, the Chief of Police, Assistant Chief of Police and all majors and captains were notified immediately of all dog bite incidents." Brief of Appellees at 33 (citations to record omitted). This information included knowledge that in the first few years of the canine unit's operation, "most" of the unit's apprehensions resulted in a bite.

**17.** Our opinion relates only the most significant

in October 1984—shortly after one of the incidents that gave rise to this action.[18] Barnes testified concerning his tenure as follows:

Q. When you [became] acting chief in 1984, did you make any changes regarding the West Palm Beach Police K9 unit?

A. Some.

Q. Why did you make those changes?

A. One of the reasons, one of the things that I was told to do when I came back was to look into the K9 situation. The city manager felt there was [sic] problems and he wanted me to look into it and do something about it.

Q. Did you become aware of problems with the K9 unit from any other source other than the city manager's office?

A. Well, it was just general conversation around that maybe we were having too many bites and it should be looked into to see what I thought about it.

Premised on Barnes' testimony, we believe that a reasonable jury could have found that the City of West Palm Beach and its former police chief knew that the canine unit was operating in an unacceptable manner and that they failed to take remedial action, thus becoming deliberately indifferent to the constitutional rights of appellants.[19]

Viewing the direct and circumstantial evidence in the light most favorable to appellants, we conclude that there was ample proof upon which a jury could have found appellees liable under 42 U.S.C. § 1983 (1982); the district court therefore erred in granting appellees judgment n.o.v. Accordingly, we vacate the judgment n.o.v. and direct the district court to reinstate the jury's verdict in favor of appellants against the City of West Palm Beach and its former chief of police.

V.

■ As their third assignment of error, appellants contend that the trial court erred in refusing to certify their suit as a class action. We disagree. The Federal Rules of Civil Procedure allow an individual to sue on behalf of a class only if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). With regard to the second of these requirements—commonality—Rule 23 further specifies that "the questions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). In other

---

evidence concerning municipal policymakers' notice as to problems within the canine unit. The record was replete with other facts from which a jury could have inferred such notice. For example, the evidence revealed that officers in the canine unit placed yellow stars on the doors of their police cars, each star indicating an apprehension. A larger yellow star later was used to indicate fifty apprehensions. These became a status symbol among the members of the unit. Acting Police Chief Barnes testified that these stars made "individuals I think feel that they might want to get another star on their vehicle and they might be a little bit more aggressive than they would under any other circumstances." With West Palm Beach police cars blatantly displaying these stars, the jury could have inferred that city policymakers were or should have been aware of problems within the unit.

18. Barnes served as acting chief of police until March 1985.

19. At trial, appellants also attempted to introduce into evidence the fact that five lawsuits alleging the unconstitutional use of excessive force had been filed against Officer Pontieri. Counsel told the district court that appellants wished to use this evidence to establish "that the [police department's] supervision was so lax that even when he got five lawsuits against him, no one in the department even said to him what are you doing?" The court, however, refused to admit this evidence, evidently concluding that its relevance was outweighed by its possible prejudicial effect. See Fed.R.Evid. 403. Without so holding, we note that the court's exclusion was almost certainly erroneous. As our textual discussion indicates, the municipal authorities must have known or have had reason to know that its officers were engaged in unconstitutional conduct as a precondition for municipal liability under 42 U.S.C. § 1983 (1982). Any evidence establishing such notice was therefore not only highly relevant, but essential to appellants' case.

words, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir. Unit B 1982).[20] As we have already discussed, when presented with allegations that a police officer used excessive force in the apprehension of a suspect, the federal courts must assess the reasonableness of the officer's actions in light of the essentially unique factual circumstances accompanying the arrest. *See supra* at III. Such determinations cannot be made *en masse,* and such suits therefore are especially unsuited to class disposition. The district court did not err in refusing to certify appellants' suit as a class action.

## VI.

The judgment of the district court is

AFFIRMED in part, VACATED in part, and REMANDED for a determination of damages.

---

20. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.