SORONDO, Judge.
• The Chief of Police of the City of Hialeah, Rolando Bolanos, (“Bolanos”), and Officers Lionel Gracia (“Gracia”), Terrance Burke (“Burke”), and Steve Lublinski (“Lublinski”), appeal the trial court’s non-final order denying their motions for summary judgment against Stanley Bain (“Bain”), a minor, by and through his parent, Eleanore Bain, and Eleanore Bain, individually.
Pursuant to the Florida Supreme Court’s decision in Tucker v. Resha, 648 So.2d 1187 (Fla.1994), wherein the Court held that “an order denying summary judgment based upon a claim of qualified immunity is subject to interlocutory review to the extent that the order turns on an issue of law,” we have jurisdiction. See also Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); City of Hialeah v. Fernandez, 661 So.2d 335 (Fla. 3d DCA 1995).
On November 17, 1990, while working an off-duty security job at a carnival, Officer Castillo took a report from a carnival worker who identified Bain as the man who stole his wallet.[1] Bain admitted that when he saw Castillo talking to the worker, who pointed at him, he was scared that the worker might be saying something to get him in trouble and that Castillo would discover that he was a runaway. Castillo turned toward Bain, who fled in the direction of Officer Lublinski, who was also working off-duty security.
Castillo began pursuit and advised Lublin-ski over the police radio to “stop the black male with the blue shirt, he just stole a wallet.” Bain ran past Lublinski, who assumed from the transmission and flight that Bain had just committed a strong-arm robbery. Lublinski was unaware at the time whether Bain was armed or unarmed, or whether he was an adult or a juvenile. Lub-linski began pursuit and advised of the chase over his police radio.
Gracia, a canine unit police officer, heard the chase and perimeter transmissions from Lublinski. Before initiating his search, Gra-cia confirmed the charge, area of search and subject description. Both Gracia and Burke heard the transmissions on the main radio channel describing the offense as a strong-arm robbery.
Within minutes after Gracia arrived, Lub-linski learned from Castillo that no robbery was involved and transmitted over a different channel that the offense was not a robbery as reported but a theft.[2] Gracia and Burke did not hear the broadcast that the offense was not a robbery. Lublinski also tried unsuccessfully to contact Gracia and directly inform him about this. At all times during the search, Gracia acted on information that the subject was wanted for strong-arm robbery.
Gracia, accompanied by Burke, initiated an area search with his police dog, Zorro, by means of a 6-foot search leash, and gave the command to “find the man.” Zorro picked up a scent and pulled Gracia down an alley. Bain stated that Gracia entered the alley with his dog a minute or two after Lublinski left the alley. Lublinski had been unable to locate Bain even though he had come within a foot of where he was hiding.
Zorro began sniffing at the fence indicating to Gracia that it wanted to go to the other side. Up to this point, it is undisputed that Zorro was restrained by the leash held by Gracia. Because Zorro had arthritis, Gra-cia had to boost it over the fence. Gracia ordered the dog to stay while he climbed the fence after it. Gracia testified at deposition that he had control of Zorro’s leash the entire time, but Bain testified that the handler was not holding the dog’s leash after it was boosted over the fence. Gracia again commanded Zorro to “find the man.”
Within seconds, Zorro picked up Bain’s scent, darted into the bush, locked its jaws around the back of Bain’s arm, and began to pull Bain out of the bush, in the manner in which it had been trained to apprehend a suspect. Gracia did not know that Bain was *481 hiding in the bush until Zorro bit him, Bain began screaming, and Zorro pulled him out from the bush. Bain thought only 10-20 seconds elapsed between the time the dog got over the fence and the time it bit him. There is a dispute as to whether there was one or more than one bite. It is undisputed that after the bite(s) there was continuous “yanking” until Zorro released him.
After Bain was pulled out of the space he was hiding in and Gracia could see him and determine he was unarmed and posed no threat, Gracia commanded Zorro to release Bain. Gracia estimated this was about 8 seconds later. Bain testified that the dog was biting him for about 5 minutes.
Gracia testified that Bain had the opportunity to surrender before the bite occurred when he walked by where Bain hid. Bain admitted he saw the police searching for him before the dog came over the fence, but he did not surrender because he did not think the dog could find him. Bain feared the dog might bite him but was more afraid of punishment for running away. Bain testified none of the officers asked him to surrender or warned him they would use their dog if he did not. After the dog dragged him from the bushes, Bain testified that Gracia, Burke and Lublinski did not intervene to stop Zorro and instead encouraged it to bite and drag him by the arm.
After Zorro was called off, Bain was handcuffed with his arms behind his back by Burke. Gracia ordered that fire rescue be called to treat Bain’s wound and ordered Officer Perez to transport Bain to the hospital. Bain’s handcuffs were removed so that paramedics could treat his wound, he was then re-cuffed for transport to the hospital. The officers testified it was standard procedure to handcuff a felony suspect for protection, whether male, female, or juvenile, even if the suspect was injured or possibly dead.
Both Gracia and Zorro had undergone specialized and continuous canine training. Supervisors had reviewed the circumstances of the dog bite and found that Gracia followed departmental canine procedure with the exception of not having contacted Lublinski prior to initiating the search.
Guidelines regarding Hialeah Police Work Dogs provide that canines be kept on leashes at all times unless they are inside a completely enclosed area. Area searches are to be conducted with 6-foot search leashes. If a dog indicates the possible presence of a hidden offender, every effort is made to effect the apprehension without a dog bite. If circumstances permit, a warning is to be given so that the offender will be afforded an opportunity to surrender. But under no circumstances will any officer be placed in a situation that compromises his safety in order to effect an apprehension without use of the dog. The release of a police dog is permitted under conditions which would authorize use of other non-lethal force, such as to apprehend a fleeing felon. For purposes of deployment, any suspect who is a fleeing felon who has not yet been searched for weapons is presumed to pose a threat to police and the community. The command “find the man” directs the canine to search for and alert the handler of the presence of a subject. Unless restrained or given a counter command the canine will apprehend (bite) the subject. Finally, the guidelines for bite situations provide that usage of a dog is not justified to apprehend misdemeanor retail theft offenders, and recognize that a legitimate bite situation occurs when a dog locates a hidden suspect and the bite is spontaneous.
The Bains maintained that the use of Zorro without prior warning constituted unreasonable use of excessive force as he was capable of and did cause “serious bodily injury” to Bain.
QUALIFIED IMMUNITY
In Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court of the United States said:
[Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
The Eleventh Circuit Court of Appeals has further clarified this area of law in Lassiter v. Alabama A & M University, Board of *482 Trustees, 28 F.3d 1146 (1994). In a six step analysis the Court summarized the law of qualified immunity as follows:
I. Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no “clearly established statutory or constitutional rights of which a reasonable person would have known.... ” The qualified immunity doctrine means that government agents are not always required to err on the side of caution.
II. That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities.... Unless a government agent’s act is so obviously wrong, in the light of pre-ex-isting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.... Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.
III. For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant’s place, that what he is doing violates federal law.... Qualified immunity is a doctrine that focuses on the actual, on the specific, on the details of concrete cases.
IV. Because qualified immunity is a doctrine of practical application to real-life situations, courts judge the acts of defendant government officials against the law and facts at the time defendants acted, not by hindsight, based on later events.
V. The subjective intent of government actor defendants plays no part in qualified immunity analysis.
VI. A decision on qualified immunity is separate and distinct from the merits of the case — a principle illustrated by the Supreme Court’s willingness to treat the denial of qualified immunity at summary judgment as an appealable collateral order.
Id. at 1149-50 (emphasis added).
• The Court observed that the most common errors it encounters concern the third point above. In this regard the Court stated that “[gjeneral propositions have little to do with the concept of qualified immunity.” Muhammad v. Wainwright, 839 F.2d 1422, 1424 (11th Cir.1987). “If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.” Post v. City of Fort Lauderdale, 7 F.3d 1552 (11th Cir.1993), modified, 14 F.3d 583 (11th Cir.1994). “The line is not to be found in abstractions — to act reasonably, to act with probable cause, and so forth — but in studying how these abstractions have been applied in concrete circumstances.” Post, 7 F.3d at 1557. The Court went on to quote from its decision in Adams v. St. Lucie County Sheriff’s Dept., 962 F.2d 1563, 1573, 1575 (11th Cir.l992)(Edmonson, J., dissenting), dissent adopted as majority opinion on rehearing en banc, 998 F.2d 923 (11th Cir.1993):
When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate ease. But they do need to be materially similar.... Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided eases.
Lassiter, 28 F.3d at 1150.
In Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir.1988), the Eleventh Circuit re-stated its two-step framework for analyzing the objective reasonableness test for qualified immunity:
1. The defendant public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.
2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defen *483 dant’s part. This burden is met by proof demonstrating that the defendant public official’s actions violated clearly established constitutional law.
See also Zeigler v. Jackson, 716 F.2d 847 (11th Cir.1983).
There is no doubt that the first prong of this analysis has been satisfied as to all defendants in this ease. Whether or not the second prong has been satisfied is the analysis we turn to now. Because the respective participation of Bolanos, Gracia, Burke and Lublinski differs substantially, we address each of them individually.
OFFICER GRACIA
Our review of the record reflects that Bain’s claim of excessive force against Gracia is based on two separate incidents which occurred in close, temporal proximity. First, he claims that Gracia mishandled the dog during his arrest in that Gracia was not holding the dog’s leash at the time that he was bitten. Second, that after the dog pulled him out of the bushes, Gracia, along with Burke and Lublinski, laughed and encouraged the dog to continue the attack. Although the second claim arose in sequence and immediately after the first, for purposes of this analysis we address these incidents separately.
As our factual recitation above sets forth, because the police dog in this case suffered from arthritis, Gracia was forced to assist the animal over the fence behind which Bain had chosen to hide from the police. According to Gracia he never released the dog’s leash. According to Bain, Gracia did not have control of the leash at the time he was bitten.
As of the time of the events in this case, we can find only two cases dealing with police use of a trained police dog to apprehend a fleeing felon, where the felon was bitten by the animal in question.[3] In Robinette v. Barnes, 854 F.2d 909 (6th Cir.1988), a man was found inside a ear dealership in the course of committing a burglary. Officer Barnes was summoned to the scene along with his dog, Casey. Barnes entered the building and shouted a warning that he had a police dog and that he would release it unless whoever was inside the building came out. Approximately thirty seconds later Barnes repeated the warning. Thirty seconds thereafter Barnes released the dog and gave the command, “find him.” The dog found the burglar who was apparently hiding underneath a car. The dog bit him on the neck and killed him. The Federal Sixth Circuit found that “the use of a properly trained police dog to apprehend a felony suspect does not carry with it a ‘substantial risk of causing death or serious bodily harm.’ ”[4] Id. at 912. The court further found that “when a properly trained police dog is used in an appropriate manner to apprehend a felony suspect, the use of the dog does not constitute deadly force.” Id. at 913. Finally, the court held that even if it were concluded that the use of a police dog to apprehend a suspected felon constituted deadly force, the use of such force to seize the burglar was not unreasonable under the circumstances and affirmed the granting of the officers’ motion for summary judgment. Id. at 913.
The second case is Kerr v. City of West Palm Beach, 875 F.2d 1546 (11th Cir.1989). The holding in Kerr concerned the liability of the Chief of Police, in his supervisory and training capacity, and the City of West Palm Beach. The police officers who actually handled the dogs in question were found liable by the jury and ultimately settled with the plaintiffs, but their eases were not before the *484 court on appeal. Nevertheless the facts of the case are instructive.
The case involved three plaintiffs, Josh Terrell, Jerome Arnold and Uwaine Kerr. On July 7, 1982, Terrell, while drunk, fell asleep in the front yard of a West Palm Beach home. Unfortunately for him the police received a report of a burglary in the area. Terrell was not the burglar they were seeking. The police summoned Officer Pontieri and his dog, Sultan, to the area. Sultan picked up a scent and led Pontieri to Terrell who was asleep in the bushes. Pontieri told Sultan to “Get 'em,” and the dog bit Terrell on his arm. Pontieri commanded the dog to pull back and the dog pulled Terrell out of the bushes. Once Terrell was out in the open Pontieri ordered the dog to release. Terrell then got up and moved toward Ponti-eri, who knocked him to the ground by hitting him on the head with a flashlight. Pon-tieri then handcuffed Terrell, at which point Terrell was again bitten, this time on the thigh.
On November 24, 1982, Jerome Arnold stole some fishing rods and reels. Hearing the arrival of the police he ran and climbed a tree. Officer Pontieri responded with his dog, Sultan. With the help of the dog they found Arnold. Because Arnold refused to come down from the tree, Pontieri grabbed him by the foot and pulled him down. Arnold was forced to lie on his stomach. While lying on the ground Sultan attacked Arnold, locking onto his arm. The dog refused to release Arnold when instructed and released only after it was hit over the head with a flashlight.
The last case was that of Urwaine Kerr. While walking through a park, Kerr was observed by Officer Chestnut. Upon seeing the officer, Kerr hid in some bushes. Accompanied by his dog Nick, Chestnut ordered Kerr to come out; Kerr panicked and ran. Having run out of the park Ken-paused to urinate against the side of a building. While facing the building, Ken heard someone behind him say, “Stick him”; the dog attacked Ken who suffered wounds to his upper thighs. No charges were filed against Ken.
Accepting Bain’s version of the facts as true, and having carefully reviewed Robinette and Kerr, we do not believe that the law in this area was clearly established in November of 1990 “in such a concrete and factually defined context to make it obvious to all reasonable government actors, in [Gracia’s] place, that [releasing the dog’s leash] violated federal law.” Lassiter, 28 F.3d at 1149. In reaching this conclusion we are conscious of the fact that at the time of his anest, as best as Gracia knew, Bain was a fleeing felon; that Gracia had given the dog the “find the man” command as opposed to the “stop the man” command which instructs the animal to attack, and, finally, that because of the dog’s training, the “find the man” command can result in a spontaneous bite by the animal when, as here, it suddenly and unexpectedly comes across the subject of its search.
Bain cites Robinette to support his argument that a warning was necessary in this ease. The facts of the present case, however, are distinguishable from the facts of Robi-nette. In Robinette the police knew that a suspected felon was present inside the building in question. There could be no doubt that the dog would ultimately find the suspect and detain him by biting him. The warning communicated by the dog’s handler was made because a violent confrontation between dog and felon was inevitable. In the present case there was absolutely no indication that Bain was hiding in the bushes immediately behind the fence Gracia and his dog climbed.
Bain further argues that because the guidelines for Hialeah Police Work Dogs provide that canines be kept on leashes at all times unless they are inside a completely enclosed area, Gracia’s release of the leash constituted a violation of Bain’s constitutional rights. We do not agree. In Edwards v. Baer, 863 F.2d 606 (8th Cir.1988), the Eighth Circuit Court of Appeals stated:
While the unfortunate incident that gave rise to this lawsuit would not have occurred if [the officer] had followed the department’s guidelines, police department guidelines do not create a constitutional right.... A public official does not lose his qualified immunity merely because his *485 conduct violates some statutory or administrative provision.
Id. at 608. See also Hodge v. Jones, 31 F.3d 157, 168 (4th Cir.1994), cert. denied, 513 U.S. 1018, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994); Bartlett v. Fisher, 972 F.2d 911, 915 (8th Cir.1992); Brandon v. District of Columbia Bd. of Parole, 823 F.2d 644, 648 (D.C.Cir. 1987); Harris v. Birmingham Bd. of Education, 817 F.2d 1525, 1527 (11th Cir.1987). We find that a failure to warn under these circumstances would not constitute a waiver of Gracia’s qualified immunity.
The second part of the claim is more troubling. According to Gracia the dog bit Bain for no more than a few seconds. Bain testified that the dog was biting him for five minutes, during which time Gracia, Burke and Lublinski laughed and encouraged the dog to continue the attack. Although improbable, if true, Bain’s claim would be sufficient to overcome Gracia’s defense of qualified immunity.[5] It is clear to. us that all reasonable police officers, at the time of these events, would have known that allowing a trained police dog to bite and tear at a suspect’s arm, after the suspect no longer presented a threat to the officers was a violation of federal law. Kerr, supra. Consequently, as concerns any injuries suffered by Bain after he was pulled out of the bushes by the dog and clearly incapable of harming the police officers, we find that Gracia is not protected by qualified immunity.
OFFICERS BURKE AND LUBLINSKI
Officers Lublinski and Burke were involved in the search for Bain. The Complaint herein alleges that Lublinski violated Bain’s constitutional rights by erroneously broadcasting that Bain had committed a strong-arm robbery and by failing to advise other officers that Bain was a minor. These allegations are insufficient to overcome Lub-linski’s claim of qualified immunity. The fact that the call went out as a strong-arm robbery as opposed to a burglary of a dwelling, the actual crime, is meaningless because Lublinski was entitled to rely on the information conveyed by his fellow officers.[6] Both crimes are second degree felonies and equally serious under Florida law. As concerns Bain’s age, there is no evidence in this record to suggest that anyone knew Bain’s age until after he was arrested.[7] Under no analysis can these errors be found to constitute violations of Bain’s constitutional rights.
Turning now to Bain’s more realistic claims against Lublinski and Burke, these officers’ first significant contact with Bain came at the very end of the events described above when the police dog bit and dragged Bain out of the bushes. Accepting the facts in the light most favorable to Bain, Burke and Lublinski stood next to Officer Gracia and laughed while the police dog dragged Bain out of the bushes. Bain also testified in deposition that the officers yelled at the dog encouraging it to continue to bite. Although it is clear that the dog is trained to respond only to its handler, Officers Gracia, Burke and Lublinski had a legal obligation to intercede on Bain’s behalf if, as Bain alleges, Gracia was employing excessive force in making the arrest. Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560 (11th Cir. *486 1993)(A police officer has a duty to intervene when another officer uses excessive force); Ting v. United States, 927 F.2d 1504, 1511 (9th Cir.1991)(In a Bivens suit, the courts will apply general principles of § 1983 law regarding law enforcement officers’ duty to intervene to prevent injuries to a citizen from other law enforcement officer); Gaudreault v. Mun. of Salem, Mass., 923 F.2d 203, 207 n. 3 (1st Cir.)(An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer’s use of excessive force can be held liable under § 1983 for his non-feasance), cert. denied, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991); O’Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988)(A law enforcement officer has an affirmative duty to intercede on behalf of a .citizen whose constitutional rights are being violated in his presence by other officers); Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-42 (11th Cir.1985) (It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under § 1983, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer’s use of excessive force, can be held liable for his non-feasance); Harris v. Chanclor, 537 F.2d 203, 206 (5th Cir.1976)(A jailor who was present and failed to intervene when plaintiff was beaten by a police officer was liable for his failure to act); Gibson v. City of Clarksville, 860 F.Supp. 450 (M.D.Tenn.1993)(Summary judgment on a qualified immunity claim was denied in a case where police officers stood by as dogs under the control of another officer bit the arres-tee).
As concerns Burke, Bain further alleges that after he was released by the dog and taken into custody, Burke handcuffed him even though his arm was obviously injured, and that because of this the injury to his arm was aggravated.
In Soares v. State of Connecticut, 8 F.3d 917 (2d Cir.1993), the appellant argued that because he was charged with a minor and non-violent crime, physical custody and handcuffing were unreasonable applications of force in violation of his Fourth Amendment rights. The court stated that on the issue of whether an excessive force claim can be premised on an officer’s handcuffing of a subject in custody
[Tjhere is still no clear authority on whether and under what circumstances, if any, a person has a constitutional right not to be handcuffed in the course of an arrest.
Id. at 922. See also Wilson v. Meeks, 52 F.3d 1547 (10th Cir.1995); Howard v. Dickerson, 34 F.3d 978 (10th Cir.1994).
We note that the events in Soares occurred in the spring of 1990, barely seven months before the events in this case. We conclude that the law concerning the excessive use of force in the process of handcuffing was not clearly established at the time of these events. Accordingly, we find that Burke was protected by qualified immunity at the time he handcuffed Bain. In as much as the Complaint also presents general claims against Gracia and Lublinski reference the handcuffing of Bain, our holding is the same as to those two officers.
POLICE CHIEF ROLANDO BOLANOS:
SUPERVISORY LIABILITY
It is undisputed that Bolanos was not present, or in any way directly involved in any of the events that led up to the alleged constitutional violations herein. Bolanos is named in this lawsuit in his capacity as the Chief of Police for the City of Hialeah and the supervisory responsibilities he has over the officers under his command. The law is clear that the liability of supervisors cannot be grounded upon a theory of respondeat superior. Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir.1989); Wilson v. Cross, 845 F.2d 163, 165 (8th Cir.1988); H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1086 (11th Cir.1986)(citing Monell v. Department of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). In Brown v. Crawford, 906 F.2d 667 (11th Cir.1990), cert. denied, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991), the Eleventh Circuit summarized the test for supervisory liability as follows:
Supervisory liability occurs when the supervisor personally participates in the alleged constitutional violation or when there *487 is a causal connection between actions of the supervising official, and the alleged constitutional deprivation. (Citations omitted). The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. (Citations omitted). The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.
Id. at 671.
Applying the legal principles recited above, we have thoroughly reviewed the record herein and can find no evidence that Chief Bolanos’ actions, or inaction, contributed to the alleged constitutional violations in this case.
CONCLUSION
We affirm the denial of the motions for summary judgment filed by Officers Gracia, Burke and Lublinski and remand for trial. We reiterate that on remand the § 1983 claims will be limited to the issue of whether Bain’s constitutional rights were violated by the officers during the events that transpired after the initial dog bite, i.e. the bite(s) and/or “yanking” the police dog inflicted upon Bain after he was pulled out of the bushes and no longer presented a threat to the officers.
We reverse the denial of Chief Rolando Bolanos’ motion for summary judgment and remand with directions that his motion be granted.
Nothing in this opinion is intended to, in any way, affect the remaining counts of Bain’s complaint.
Affirmed in part; reversed in part and remanded with instructions.

. Earlier that day the carnival worker had seen Bain carrying a portable stereo with noticeable scratches that was stolen along with a wallet from the worker’s tent 3 days earlier. Bain denied stealing it and ultimately was not prosecuted for any offense.

. Appellants maintain that the offense was also erroneously described as theft, as the offense was actually burglary, a felony.

. We note that our search was limited to United States Supreme Court, Federal Circuit Court, Florida Supreme Court and Florida District Court cases because United States District Court cases cannot "clearly establish” law for this purpose. Adams v. St. Lucie County Sheriff's Dept., 962 F.2d 1563, 1575 (11th Cir.1992)(Edmonson, J., dissenting), dissent adopted as majority opinion on rehearing en banc, 998 F.2d 923 (11th Cir.1993); Muhammad v. Wainwright, 839 F.2d 1422, 1425 (11th Cir.1987).

. Acknowledging that the use of the police dog did result in the death of Daniel Briggs, the Court noted that the tragedy was an "extreme aberration from the outcome intended or expected.” The Court went on to observe that in the twenty year history of the United States Police Canine Association, a national organization, there was no recorded incident where a person had died as a result of being apprehended by a police dog.

.There is merit to the officers’ position that if the dog had been biting and tearing at Bain’s arm for five minutes, the arm would have been shredded. We do not, however, find the exact amount of time to be relevant to our analysis. The significant factor is whether the animal was allowed to continue to maul Bain after he had been subdued and presented no threat to the officers.
We note in the case law dealing with dog-bite situations that, having bitten a subject, police dogs will often fail to release when first commanded to do so. In Kerr, one of the dogs refused to release the subject and eventually had to be hit on the head by its handler to get it to release. This type of delay is not the type we address here. Bain’s testimony in this case is that after he was rendered helpless and while in great pain, the officers laughed and encouraged the dog to continue its attack. It is this alleged conduct to which we refer.

. United States v. Hensley, 469 U.S. 221, 232, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985); United States v. Rodriguez, 831 F.2d 162, 166 (7th Cir.1987) cert. denied 485 U.S. 965, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988); United States v. Ferreira, 821 F.2d 1, 5 (1st Cir.1987); United States v. Longmire, 761 F.2d 411 (7th Cir.1985).

. Bain was only twelve years old at the time, but the arrest report described him as 5'8" tall and weighing 140 lbs.