**Phillip SAMARCO, Plaintiff,**

v.

**Robert NEUMANN, in his official capacity as Sheriff of Palm Beach County, and Randy Christensen, individually and in his official capacity as deputy of the Palm Beach County Sheriff's Office, Defendants.**

**No. 96–8522–CIV.**

United States District Court,
S.D. Florida.

March 4, 1999.

Arthur Thomas Schofield, West Palm Beach, FL, for plaintiff.

Fred H. Gelston, West Palm Beach, FL, Anthony J. Alfero, Ft. Lauderdale, FL, for defendants.

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion for Summary Judgment on the claims filed against Defendants in their official capacities [D.E. # 70] and Defendant Randy Christensen's Motion for Summary Judgment on the claim filed against him individually [D.E. # 78]. Plaintiff brought this suit against Defendants Robert Neumann and Randy Christensen in their official capacities as Sheriff and Deputy Sheriff of Palm Beach County, respectively, and against Randy Christensen, individually. Plaintiff's federal claims allege violations of 42 U.S.C. § 1983 for deprivations of his Fourth Amendment right to be free from unreasonable seizure.

Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims which arise under federal law. Additionally, 28 U.S.C. § 1343(4) invokes the original jurisdiction of the Court over all claims predicated upon violations of civil rights.

Plaintiff originally filed a four-count complaint in the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida. Counts I and II allege deprivations of Plaintiff's Fourth Amendment rights under the U.S. Constitution, in violation of 42 U.S.C. § 1983. Count III alleged battery, while Count IV sounded in negligence. Defendants successfully removed the case to the Southern District of Florida, based on the civil rights violations alleged against Defendants. However, as Counts III and IV were predicated on state law, those

counts were remanded to state court for disposition. Accordingly, only Counts I and II remain pending before the Court.

Defendants have moved for summary judgment on the § 1983 claims brought against them in their official capacities. Defendants assert that summary judgment in their favor is appropriate because: (1) Plaintiff has not established the existence and implementation of an unconstitutional policy; and (2) the use of a police dog to apprehend fleeing felony suspects is not excessive force *per se*. Defendant Christensen has moved for summary judgment on the claims against him in his individual capacity claiming that he is entitled to qualified immunity.

The Court has carefully considered the parties' arguments, the relevant case law, and the record as a whole and concludes that the motions for summary judgment should be granted.

## I. Factual and Procedural Background

Plaintiff Phillip Samarco's claims arise out of an incident that occurred on the morning of July 21, 1995. On that date, Samarco contends that the force used to apprehend and arrest him was excessive under the circumstances, and therefore, violated his Fourth Amendment right to be free from unreasonable seizure. Samarco further contends that the Palm Beach County Sheriff's failure to place constitutional limits on the use of canines to seize suspected felons constituted an unconstitutional policy for which the Sheriff's Office should be held liable under § 1983. Implementation of this allegedly unconstitutional policy caused Samarco to sustain serious and permanent injuries.

 Under the Fourth Amendment, the force used by law enforcement officers must be evaluated in light of the objective circumstances present at the time the decision to use force was made. *See Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). To assess the reasonableness of the force used, "careful attention to the facts and circumstances of each particular case" is necessary. *Id.*

The facts and circumstances relevant to Samarco's Fourth Amendment claims, viewed in the light favorable to Samarco, reveal that in the early morning of July 21, 1995, Samarco became involved in a verbal altercation with Marshall Tiara and Barbara Rehman at a Boca Raton residence. The argument escalated when Rehman refused to leave with Samarco. As a result, Tiara chased Samarco off the property. Samarco reacted by throwing a rock in the direction of Tiara and Rehman, striking the house.

While leaving the scene, Samarco backed his truck into two cars parked in the driveway. He then veered his vehicle towards Tiara, who jumped behind a tree, thereby avoiding impact. As he drove off, Samarco ran over two mailboxes that lined the street.

At approximately 8:30 a.m., Rehman contacted the Palm Beach County Sheriff's Office for assistance. Consequently, deputies were dispatched to investigate. Deputy Charles Nicastro was the first officer to arrive at the scene. Rehman and Tiara identified Samarco as the perpetrator of the damage. Based on these witnesses' accounts, Deputy Nicastro formed the belief that Samarco had committed aggravated assault, an act designated as a felony under Florida law. Rehman also informed the deputy that Samarco frequently carried knives.

Through records accessible to the Sheriff's Office, Deputy Nicastro obtained Samarco's address. These records also revealed that, during previous arrests, Samarco had resisted with violence and used narcotics. Based on his criminal history and the witness accounts of the events of July 21, 1995, Samarco was believed to be dangerous.

Deputy Nicastro proceeded to Samarco's address, where he lived with his parents. Samarco's truck was parked in front of the

house. Deputy Nicastro, who was later joined by Deputies Christopher Dunn and Scott Thomas, attempted to elicit information from Samarco's parents, who were uncooperative. Absent a warrant, Mrs. Samarco refused to provide information about her son or access to the house. Deputy Nicastro then returned to the scene of the argument.

Samarco, returning to his house from the pool area of the housing complex, spotted the officers' vehicles. Believing he might be in trouble for his altercation with Tiara, Samarco ran.

Shortly thereafter, the Sheriff's Office received information that someone matching Samarco's description was seen running through his housing complex. The caller reported that Samarco came to her house. Although he was denied entry, Samarco commented that he had no intention of going to jail. Additional officers were dispatched to the complex.

Sargent John Morrisey, the highest ranking officer assigned to the scene of the search, stationed twelve deputies at intervals forming a five-block perimeter. This area was cordoned off to contain Samarco. A helicopter conducted an aerial search. Deputy Christensen and his canine partner, Faero, were also summoned. Upon his arrival shortly after 9:30 a.m., Deputy Christensen was given a description of Samarco and told that he was wanted for aggravated assault. A radio transmission had warned the deputies, including Christensen, that Samarco may be armed with a knife. Placing Faero on a thirty-foot lead, Deputy Christensen began to search for Samarco.

While deputies encircled the complex, Samarco engaged in several evasive tactics to avoid capture. Along the way, Samarco obtained a pair of scissors and put them into his back pants pocket. He continued to flee, ultimately hiding in a cluster of bushes within the perimeter. Although Samarco heard the helicopter overhead and knew he was the subject of an intense search, he remained hidden, hoping to outlast the tenacity of his pursuers.

About forty-five minutes from beginning his search, Faero alerted on the bushes that concealed Samarco. Although only six to eight feet from the bushes, Deputy Christensen could not see Samarco. After calling for back up, Deputy Christensen claims that, pursuant to written procedures, he gave Samarco the opportunity to surrender. Specifically, Deputy Christensen states that he twice announced: "this is the Palm Beach County Sheriff's Office. I am giving you the opportunity to surrender before I release the police dog that will bite you. Identify yourself now."

Samarco contends that he never heard these announcements. However, he admits that Faero entered, then exited the bushes before reentering to apprehend him. Nevertheless, receiving no response, Faero was taken off his lead and was commanded to bite Samarco. Faero obeyed Deputy Christensen by biting and holding onto Samarco's lower leg.

During the struggle that ensued, Samarco reached for the scissors in his pocket. When Sargent Morrisey arrived shortly thereafter to help subdue Samarco, Deputy Christensen ordered Faero to release his grip. Having received obvious injuries to his leg, Samarco was transported to a local hospital for medical treatment. He was subsequently arrested.

Samarco claims that, consequent to Faero's bite, he sustained muscle tissue loss and permanent nerve damage. He further claims that he posed no threat of danger to Deputy Christensen or the public. Significantly, Samarco alleges that, even after he was captured and subdued, Deputy Christensen encouraged Faero to bite Samarco for fifteen minutes. Based on Samarco's recollection, he contends that the force used to arrest him was excessive, and therefore, unreasonable under the Fourth Amendment. According to Samarco, his injuries are the result of an official policy which failed to place constitutional limits

on the use of canine seizures. Samarco seeks relief pursuant to § 1983.

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment where the pleadings and supporting materials demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one that might *affect* the outcome of the suit under the governing law. *Id.* A plaintiff cannot defeat a defendant's properly supported motion for summary judgment without an affirmative presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations of the pleadings. *Id.* A mere scintilla of evidence is insufficient to defeat a motion for summary judgment:

> [I]n every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Id.* at 251, 106 S.Ct. 2505. In reviewing a motion for summary judgment the court focuses on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson, supra*).

To determine whether there exists a genuine issue precluding summary judgment, federal courts employ the two-prong framework of shifting burdens established by the U.S. Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This framework places the initial burden on the moving party to establish the absence of a genuine issue as to any material fact. *See Allen,* 121 F.3d at 646 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). The moving party may discharge this burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. In deciding whether the burden has been satisfied, the Court must view the evidence and all reasonable inferences arising from it in the light most favorable to the nonmoving party. *See Allen,* 121 F.3d at 646 (citation omitted).

Once the movant has satisfied its burden, the burden shifts to the nonmoving party to present evidence sufficient to make a "showing that the jury could reasonably find for that party." *Allen,* 121 F.3d at 646 (citations omitted). Facts asserted by a summary judgment opponent must be regarded as true if supported by affidavit or other evidentiary material. *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir.1981). However, where the nonmoving party fails to prove an element essential to that party's case and on which that party will bear the burden of proof at trial, summary judgment is warranted. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.; see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen,* 121 F.3d at 646.

■ On a motion for summary judgment, courts lack authority to determine the truth of a matter in dispute. Thus, the Court's task is merely to identify those disputed matters and to determine the de-

gree of their importance to the pending action. *See id.*

## III. Discussion and Analysis

 Samarco alleges that Sheriff Neumann and Deputy Christensen violated his constitutional rights guaranteed by the Fourth Amendment, as enforced by 42 U.S.C. § 1983. He has brought suit against these defendants in their official capacities, and against Christensen in his individual capacity. To establish official capacity liability under § 1983, there must be a policy or custom behind the deprivation of a federal right. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). For establishing § 1983 liability in an individual capacity, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.* Defendants do not dispute that while acting within the scope of their employment, they act under color of state law. However, they do contend that Samarco was not deprived of any federal rights and that they are immune from suit in both their official and individual capacities.

### A. Establishing a Claim Pursuant to § 1983

 Violations of § 1983 occur when a person suffers the deprivation of rights secured by the U.S. Constitution and federal laws inflicted by one acting "under color of any state statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia." 42 U.S.C. § 1983; *see also Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). The statute was designed to provide a "broad remedy for violations of federally protected rights." *Monell v. Department of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 685, 98 S.Ct. 2018, 2033, 56 L.Ed.2d 611 (1978). Since § 1983 confers no substantive rights, a plaintiff seeking relief under the statute must bring a § 1983 claim in conjunction with some other statute or constitutional

provision that provides substantive rights. *See Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979) ("one cannot go into court and claim a violation of section 1983—for section 1983 by itself does not protect anyone against anything"); *see also Arrington v. Cobb County,* 139 F.3d 865, 872 (11th Cir.1998); *Barfield v. Brierton,* 883 F.2d 923, 934 (11th Cir.1989) ("An underlying constitutional right must exist before a § 1983 action will lie."). The underlying basis for Samarco's excessive force claim is the Fourth Amendment.

### 1. Rights Conferred by the Fourth Amendment

 The Fourth Amendment guarantees that all individuals will "be secure in their person ... against unreasonable seizures." U.S. Const. amend. IV. Claims that law enforcement officers used excessive force in apprehending a criminal suspect are governed by the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Under the Fourth Amendment, law enforcement officers are permitted to use only that amount of force which, under the circumstances, is objectively reasonable to effectuate the seizure of a person. *See Connor,* 490 U.S. at 388–89, 109 S.Ct. at 1867–68. The question of the reasonableness of the force used against a plaintiff in a Fourth Amendment excessive force case is usually reserved to the jury. However, courts may grant a defense motion for summary judgment where, viewing the evidence from the point of view favorable to the plaintiff, the force used appears to have been reasonable. *See, e.g., Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994). Therefore, to prevail, Samarco must identify facts which show that excessive force was used to deprive him of his Fourth Amendment right to be free from unreasonable seizure in violation of § 1983.

### 2. Determining the Unconstitutional Use of Excessive Force

 To prove a Fourth Amendment violation based on the excessive use of

force, a plaintiff must demonstrate that: (1) a seizure occurred, and (2) that excessive force was used to effect the seizure. *See, e.g., Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (a seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."). Assessing allegations that an officer used excessive force in apprehending a suspect must be measured "from the perspective of a reasonable officer on the scene, rather than with the $20/20$ vision of hindsight." *Connor,* 490 U.S. at 396, 109 S.Ct. at 1872.

To determine whether the use of force to effect a seizure is reasonable in a particular instance, courts balance "the nature and quality of the intrusion on the [the suspect's] Fourth Amendment interests" against the government's countervailing interest in effective law enforcement. *Id.* at 396, 109 S.Ct. at 1871. Several factors are considered in balancing the respective interests: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 395, 109 S.Ct. at 1871. These factors cannot be applied with mathematical precision; rather, they must be evaluated within the context of how the seizure was carried out. *See, Ortega v. Schramm,* 922 F.2d 684, 695 (11th Cir. 1991) (citation omitted). Thus, whether a defendant's actions were objectively reasonable are not to be considered in a vacuum, but only in relation to "the totality of circumstances [concerning the particular seizure] without regard to their underlying intent." *Id.* (citing *Connor,* 490 U.S. at 396–97, 109 S.Ct. at 1872).

It is axiomatic that criminal activity serves no legitimate purpose. Therefore, any interest in sparing criminals from even remote consequences of their actions is minimal. The deterrent effect of forcing criminals to assume responsibility for the harm caused by their anti-social behavior is the essence of the criminal system. By contrast, law enforcement serves an important societal purpose. Taking the risk of an officer's personal liability beyond its proper scope would intimidate officers and interfere with activities necessary to protect society. Moreover, criminals can control the circumstances involved in their crimes, and thus, can minimize the risk that force will be necessary. On the other hand, officers must address situations as they find them.

Law enforcement officers have the right to use some degree of physical coercion in making an arrest. *See Connor,* 490 U.S. at 396, 109 S.Ct. at 1871. Not every use of such physical force gives rise to § 1983 liability. *See id.* The Court is not aware of any case holding that an officer's use of a police dog is excessive force *per se.* In fact, courts have recognized the constitutionality of using police dogs when an officer is placed in a threatening situation. *See, e.g., Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1553 (11th Cir.1989). Therefore, to overcome summary judgment, Samarco must show the existence of a policy by the Palm Beach County Sheriff's Office to use its canine squad in an unconstitutional manner and that Deputy Christensen violated a clearly established right secured by federal law.

**B. Plaintiff's § 1983 Official Capacity Claims**

A § 1983 claim filed against government officers in their official capacities is, in essence, a claim against the governmental entity of which the officer is an agent. *See Graham,* 473 U.S. at 165, 105 S.Ct. at 3105; *Monell,* 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55; *Hutton v. Strickland,* 919 F.2d 1531, 1542 (11th Cir. 1990). For purposes of § 1983 liability, Florida sheriffs are officials of the county, not the state, and thus, do not enjoy Eleventh Amendment immunity from suit. *See*

*Hufford v. Rodgers,* 912 F.2d 1338, 1341–42 (11th Cir.1990). Therefore, if it is established that Sheriff Neumann and Deputy Christensen violated Samarco's constitutional rights, the Sheriff's Office may be held liable for the deprivations.[1]

A governmental entity is not responsible for the unauthorized actions of its lower level employees unless the entity's final decisionmakers participated in establishing a policy or custom which, directly or indirectly, resulted in the constitutional violation. *See id.* at 694, 98 S.Ct. at 2037. In other words, the Sheriff's Office may not be held liable under § 1983 on the basis of *respondeat superior. See City of St. Louis v. Praprotnik,* 485 U.S. 112, 125 n. 2, 108 S.Ct. 915, 925 n. 2, 99 L.Ed.2d 107 (1988). For Samarco to overcome summary judgment on his § 1983 official capacity claims against Sheriff Neumann and Deputy Christensen, he must establish either: (1) that the unconstitutional deprivation was the result of a decision rendered by a final policymaker; or (2) that he was injured as the result of an unconstitutional policy or custom implemented or ratified by the Sheriff's Office. *See id.* at 127, 108 S.Ct. at 926; *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1480–81 (11th Cir.1991).

### 1. *Determining the Official Policymaker for § 1983 Liability*

The Sheriff's Office can only be liable under § 1983 for constitutional deprivations undertaken by persons with final policymaking authority. *See Scala v. City of Winter Park,* 116 F.3d 1396, 1399 (11th Cir.1997). Section 1983 "recovery

from a [governmental entity] is limited to acts that are, properly speaking, acts of the [entity]—that is, acts which the [entity] has officially sanctioned or ordered." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986).

For § 1983 liability to attach to a government entity, the "official [must] possess[ ] the authority and responsibility for establishing final policy with respect to the issue in question." *Mandel v. Doe,* 888 F.2d 783, 793 (11th Cir.1989). No final policymaking authority exists where the official's decisions are subject to, or constrained by, "meaningful administrative review." *Morro v. City of Birmingham,* 117 F.3d 508, 514 (11th Cir.1997).

#### a. *Plaintiff's Official Capacity Suit Against Sheriff Neumann*

Determining whether an official possesses final policymaking authority is a question of law for the judge to decide. *See Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989). Here, the parties have stipulated that Sheriff Neumann possesses policymaking authority regarding the hiring, training, supervision, and discipline of deputies. This, however, is not determinative of whether Sheriff Neumann had final policymaking authority with regard to instituting the policy for the use of canines in apprehending felony suspects. The Court must adhere to the Supreme Court's admonition that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applica-

1. The Supreme Court recognized that an agency of a municipality does not have an identity separate from that of the municipality, and that an officer of an agency, sued in his official capacity for constitutional deprivations, may expose the municipality to § 1983 liability. *See Brandon v. Holt,* 469 U.S. 464, 472, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985). However, suing a county sheriff in his official capacity is somewhat of a hybrid,

in that the suit is actually against the Sheriff's Office. Therefore, Samarco's suit against Sheriff Neumann and Deputy Christensen in their official capacities constitutes a suit against the Palm Beach County Sheriff's Office, which, under the Florida Constitution and the Florida Statutes, is a legal entity separate from Palm Beach County. *See* Fla. Const.Art. VIII, § 1(d); §§ 30.073, 30.079, 30.15, 30.53, Fla.Stat.

ble law purports to put it." *Praprotnik*, 485 U.S. at 126, 108 S.Ct. at 925.

■ In light of Florida statutory authority, which designates county sheriffs as independent constitutional officials, the Court finds that Sheriff Neumann, as the county's chief law enforcement officer, was the final policymaker for matters concerning the Palm Beach County Sheriff's Office. *See* § 30.53, Fla.Stat.; *Brevard County v. Miller*, 452 So.2d 1104, 1106 (Fla. 5th DCA 1984); *Weitzenfeld v. Dierks*, 312 So.2d 194, 196 (Fla.1975). Thus, acts of Sheriff Neumann found violative of § 1983 are capable of imputing liability upon the Palm Beach County Sheriff's Office.

■ However, a determination that Sheriff Neumann possesses unrestricted authority to implement policy for the Palm Beach County Sheriff's Office does not resolve the issue. The governmental entity is liable under § 1983 "only when the execution of the government's policy or custom ... inflicts the injury." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989).

#### b. *Determining Constitutionality of a Policy Under § 1983*

■ To impute § 1983 liability to a government entity based on an unlawful policy, the policy "must be the moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (citing *Monell, supra* ). Accordingly, Samarco must show that his injury was caused by a policy which was "the moving force" behind the alleged constitutional violation. In so doing, he must "identify the policy, connect the policy to the [Sheriff's Office] itself, and show that the particular injury was incurred because of the execution of that policy." *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir.1994) (citation omitted).

The gravamen of Samarco's § 1983 official capacity claim against Sheriff Neumann is that the deputies, including Christensen, were improperly trained on the constitutional limitations of the use of canine seizures. While recognizing the "failure to train" theory, the Supreme Court has restricted its application to cases "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388, 109 S.Ct. at 1204. This presents Samarco with a very difficult burden to satisfy, because in virtually all instances where constitutional deprivations are alleged against a government entity, "[a] § 1983 plaintiff will be able to point to something the [entity] could have done to prevent the unfortunate incident." *Id.* at 392, 109 S.Ct. at 1206.

■ Simply demonstrating that training could have been better is insufficient to establish liability. *See id.* Moreover, the fact that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [Sheriff's Office], for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91, 109 S.Ct. at 1206.

■ Liability for failure to train requires an affirmative act or "deliberate indifference" to a risk where the deprivation of a federal right is a "plainly obvious consequence" of inaction. *Board of County Comm'rs v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1393, 137 L.Ed.2d 626 (1997). According to the Supreme Court, an official may be liable on a § 1983 claim premised on deliberate indifference "where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 482–83, 106 S.Ct. at 1299–1300. Here, for § 1983 liability to attach to the Palm Beach County Sheriff's Office, Samarco must show that Sheriff Neumann deliberately chose not to train his deputies

in the proper use of canines to apprehend suspected felons. *See id.*

Samarco has not specifically identified how the training was deficient, or come forward with evidence to demonstrate the need for more or different training to prevent constitutional violations by deputies in the Sheriff's canine unit. *See City of Canton,* 489 U.S. at 389–91, 109 S.Ct. at 1206. Samarco's seizure itself was not so outrageous an incident as to itself indicate a policy of indifference to or tolerance of constitutional violations. *See id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10 (discussing inadequate training theory of municipal liability).

In fact, contrary to Samarco's allegations, the evidence demonstrates that the Sheriff's Office provided extensive and continual training to its canine unit. Pursuant to written Standard Operating Procedures, canine handlers and their dogs must complete a minimum of 400 hours of basic training, in compliance with police standard requirements. *See* Palm Beach County Sheriff's Office Standard Operating Procedure 521.01. Before deployment, the deputy must demonstrate total control over the canine team, including proficiency in obedience, agility, searches, and apprehensions. *See id.* Thereafter, routine in-service training is conducted to maintain proficiency.[2] Each canine team must complete annual certification evaluations. Courts have found similar training regimens constitutionally adequate. *See, e.g., Kerr,* 875 F.2d at 1549–50.

Moreover, Samarco has not presented any evidence that his injuries resulted from any directives of Sheriff Neumann, the final decisionmaker for the Palm Beach County Sheriff's Office. Nor is there evidence that Sheriff Neumann made a deliberate choice from among various alternatives to permit Deputy Christensen to use his dog, Faero, in an unconstitutional manner. Even if the Sheriff's Office had been negligent in training Christensen and Faero, negligence does not rise to the level of deliberate indifference, and the behavior of one deputy does not establish a policy. *See City of Canton,* 489 U.S. at 390–91, 109 S.Ct. at 1206 (fault must be found in the training program itself, not in the particular officer).

A careful review of the record indicates that Samarco has not shown that a policy of the Sheriff's Office caused the constitutional deprivations of which he complains. Even construing the evidence in the light most favorable to Samarco, at most, the record merely suggests that Sheriff Neumann may somehow be responsible for the actions of a subordinate. As a matter of law, § 1983 official capacity liability solely on the basis of *respondeat superior* is prohibited.

■ Evidence of a pattern or series of incidents is required to subject a government entity to liability. *See Cornfield by Lewis v. Consolidated High School Dist. No. 230,* 991 F.2d 1316, 1317 (7th Cir. 1993). Proof of one or two incidents is not enough. *See id.* Samarco must submit evidence of deficiencies on the Sheriff Office's general training of all its canine deputies, which he has failed to do. *See id.* Thus, he has not produced evidence creating a genuine issue of material fact that the Sheriff's Office has a policy of failing to train its canine units on the proper use and limits of force. Absent a policy to use the canine teams in an unconstitutional manner or evidence that Sheriff Neumann was deliberately indifferent regarding the training of these teams, summary judgment in favor of Sheriff Neumann in his official capacity is warranted.[3]

---

**2.** Deputy Christensen testified that he participates in mandatory weekly retraining sessions, which cover all facets of canine applications: tracking, area and building searches, and tactical entries. Additionally, canine officers receive weekly briefings during line-ups.

**3.** Samarco has also made a claim against Sheriff Neumann based on deficient supervision. Such a claim is analyzed identically to a failure to train claim, requiring the establishment of deliberate indifference or the existence of a conscious choice made by the offi-

## 2. Samarco's § 1983 Official Capacity Claim Against Deputy Christensen

As previously articulated, the Palm Beach County Sheriff's Office can only be liable under § 1983 for constitutional deprivations undertaken by persons with final policymaking authority or if an unconstitutional policy or custom exists. *See Scala,* 116 F.3d at 1399. Clearly, Deputy Christensen is not a final policymaking official for the Sheriff's Office. His actions are not unrestrained. Rather, they are subject to restriction and review by his commanding officers, including Sheriff Neumann. Samarco concedes as much by designating Sheriff Neumann as the maker of the canine policy for the Sheriff's Office.

The undisputed facts show that Deputy Christensen does not have final policymaking authority over the practices utilized by the canine unit. Therefore, an official capacity § 1983 claim against him is inappropriate unless the Sheriff's Office has a custom which deprived Samarco of his constitutional rights.

A local governmental entity may be held liable for deprivations "visited pursuant to a governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell,* 436 U.S. at 690, 98 S.Ct. at 2036. Proof of § 1983 liability based on "custom" requires Samarco to establish "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown,* 923 F.2d at 1481 (citations and quotations omitted). Such a widespread practice is "deemed authorized by policy-

making officials because they must have known about it but failed to stop it." *Id.* Approval of an unconstitutional practice constitutes "policy" only when a policymaker "approve[s] a subordinate's decision *and the basis for it.*" *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926 (emphasis added); *see also Hill v. Clifton,* 74 F.3d 1150, 1152 (11th Cir.1996) (affirming summary judgment under § 1983 when it was not shown that the policymaking official knew of and ratified the improper motives of his subordinates when he accepted their recommendations). Thus, to survive summary judgment on the issue of § 1983 official capacity liability, Samarco must demonstrate the existence of a custom which caused a deprivation of his federal rights, and that the custom was so widespread that Sheriff Neumann, although aware, acquiesced to the unlawful custom. *See Young v. City of Augusta, Ga.,* 59 F.3d 1160, 1171 (11th Cir.1995).

Like the policy issue, Samarco has not presented any evidence of a widespread custom of using its canine force in an unconstitutional manner, and which was known and ratified by Sheriff Neumann, the final policymaker for the Sheriff's Office. Moreover, Samarco has not shown the existence of an illicit custom that was so widespread as to constitute the force of law. He merely points to some incidents where other fleeing felony suspects were injured. Such isolated episodes, dispersed over several years, are insufficient to substantiate the existence of a widespread custom violative of § 1983. *See, e.g., Gold v. City of Miami,* 151 F.3d 1346, 1352 (11th Cir.1998); *Gomez v. Metro Dade County, Fla.,* 801 F.Supp. 674, 680 (S.D.Fla.1992); *Prieto v. Metropolitan*

---

cial. *See Gold v. City of Miami,* 151 F.3d 1346, 1351–52 (11th Cir.1998). As previously stated, failure of subordinates to follow the necessary training provided is an inadequate basis for supervisory liability. *See City of Canton,* 489 U.S. at 390–91, 109 S.Ct. at 1206. Moreover, Samarco has not shown that Sheriff Neumann was aware that Deputy Christensen was engaged in unconstitutional

conduct or was personally involved in Deputy Christensen's actions. *See Kerr,* 875 F.2d at 1557 n. 19; *McLaughlin v. City of LaGrange,* 662 F.2d 1385, 1388 (11th Cir.1981) (summary judgment in favor of the police chief whose officers were accused of police brutality was appropriate, since the chief was not involved personally).

*Dade County,* 718 F.Supp. 934, 938–39 (S.D.Fla.1989). Thus, Samarco has presented nothing probative to convince a reasonable jury that the Sheriff's Office had a custom of depriving persons of their Fourth Amendment rights to be free from unreasonably excessive force to effectuate arrests through the use of its canine units. Accordingly, summary judgment on the § 1983 claim brought against Deputy Christensen in his official capacity is warranted. Having disposed of the § 1983 official capacity claims, Samarco must overcome the rebuttable presumption that Deputy Christensen is entitled to qualified immunity on the § 1983 claim against him in his individual capacity in order to preserve any issues for trial.

### C. Claims Against Public Officials in Their Individual Capacities Under § 1983

■ Samarco's Complaint alleges that Deputy Christensen deprived him of rights guaranteed by the Fourth Amendment to the U.S. Constitution by seizing and arresting Samarco with excessive force. Sued in his individual capacity, Deputy Christensen seeks protection from suit under the doctrine of qualified immunity and has moved for summary judgment on that basis.

#### 1. *Qualified Immunity Conferred on Public Officials*

■ Government actors may be sued under § 1983 in either their official or individual capacity. When sued in an individual capacity, an official may enjoy qualified immunity from suit in certain situations. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146 (11th Cir.1994). As a general matter, even though the actions of public officials may have violated a plaintiff's constitutional rights, qualified immunity shields public officers from personal liability if those unconstitutional acts "did not violate clearly established constitutional

rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

■ To determine the propriety of qualified immunity, the official's conduct is evaluated under an objective, reasonable standard. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The official's subjective intent is irrelevant to the inquiry. *See Connor,* 490 U.S. at 397, 109 S.Ct. at 1872; *Hutton v. Strickland,* 919 F.2d 1531, 1540 (11th Cir.1990) ("the purpose of qualified immunity would be defeated if courts were to ascertain and analyze the subjective thoughts of government officials instead of basing judicial decisions on objective actions resulting from surrounding circumstances."). On the contrary, under the objectively reasonable standard, a government official performing discretionary functions is protected if "a reasonable official could have believed his or her conduct to be lawful in light of *clearly established law and the information possessed by the official* at the time the conduct occurred." *Hardin v. Hayes,* 957 F.2d 845, 848 (11th Cir.1992) (emphasis added). "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Lassiter,* 28 F.3d at 1150.

■ As long as their conduct is not unlawful, the doctrine of qualified immunity exempts public officials from damage suits to enable them to perform their responsibilities without threats of liability. *See Hutton,* 919 F.2d at 1536 (citations omitted); *see also Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1592–93, 140 L.Ed.2d 759 (1998) (an important policy reason underlying the doctrine of qualified immunity is the "strong public interest in protecting public officials from the costs associated with the defense of damages actions."). Qualified immunity is intended

to protect "all but the plainly incompetent or those who knowingly violate the law." *McCoy v. Webster,* 47 F.3d 404, 407 (11th Cir.1995) (quoting *Malley ·v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Entitlement to immunity is the rule, rather than the exception. *See Lassiter,* 28 F.3d at 1149 ("That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities.").

This Circuit applies the Supreme Court's two-part analysis to a defense of qualified immunity. First, the defendant must prove that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred. *See Hartsfield v. Lemacks,* 50 F.3d 950, 953 (11th Cir.1995). If the defendant meets this burden, then the plaintiff must show that the defendant violated clearly established law based upon objective standards. *See id.* The plaintiff satisfies this burden by demonstrating that the contours of the plaintiff's rights were so sufficiently clear that a reasonable government officer would have understood that his actions violated plaintiff's rights. *See Swint v. City of Wadley,* 51 F.3d 988, 995 (11th Cir.1995).

### 2. *Assessing Qualified Immunity for Alleged Fourth Amendment Violations*

■ Applying the two-part analysis, it must first be established that ʾDeputy Christensen was acting within the scope of his discretionary authority when he commanded Faero to seize Samarco. Proof that the official's actions were within the purview of his discretionary authority is based on objective circumstances. *See Hutton,* 919 F.2d at 1537. It is undisputed that Deputy Christensen, at all times relevant to Samarco's claims, was acting within his discretionary authority. The Standard Operating Procedures promulgated by the Palm Beach County Sheriff's Office state that the "[t]actical use and applica-

tion of the K–9 teams [is] at the discretion of individual K–9 deputies." Since Deputy Christensen was summoned to the scene and directed by his supervising officer to conduct a canine search for Samarco in accordance with official procedures, these objective circumstances support the conclusion that Deputy Christensen was acting within his discretionary authority at the time he ordered Faero to seize Samarco. Having established that Deputy Christensen was acting within the scope of his discretionary authority, the burden shifted to Samarco to demonstrate a violation of clearly established constitutional law. *See Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1236 (11th Cir.1992).

The second prong of the qualified immunity analysis requires Samarco to demonstrate that Deputy Christensen violated statutory or constitutional laws that were clearly established at the time of the seizure. *See Hutton,* 919 F.2d at 1538. To determine whether Samarco has met his burden, the Court must find that the applicable law was clearly established at the time the challenged actions occurred, and whether a genuine issue of fact exists regarding Deputy Christensen's engaging in the allegedly violative conduct. *See id.* The clearly established law prong of the qualified immunity test many not be met through references to general propositions. *See Lassiter,* 28 F.3d at 1149–50. Rather, to be "clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

### 3. *Substantiating Clearly Established Violations of the Fourth Amendment*

. To overcome qualified immunity, Samarco must show that: (1) Deputy Christensen violated a federal constitutional right; and (2) that the right was clearly established at the time of the violation. *See Santamorena v. Georgia Military College,* 147 F.3d 1337, 1342 (11th Cir.1998). Sa-

marco must show that when Deputy Christensen acted, the law was developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in Deputy Christensen's place, that what he was doing violated federal law. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993) (citing *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039). To satisfy his burden, Samarco must identify factual scenarios in preexisting case law which demonstrate that Deputy Christensen's actions were illegal. *See Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1459 (11th Cir.1997) (the qualified immunity standard compels courts to undertake a fact-intensive inquiry). This factual judgment must be made from the perspective of a reasonable officer at the scene. *See Connor*, 490 U.S. at 396, 109 S.Ct. at 1871–72.

Samarco contends that at the time of the seizure, the law governing the use of excessive force was clearly established. As of 1995, it is unquestionable that "police use of excessive force is a constitutional violation." *McKinney v. DeKalb County*, 997 F.2d 1440, 1443 (11th Cir.1993). After *McKinney*, any reasonable officer would know that the use of excessive force is redressable under the Fourth Amendment. Although the use of excessive force in effecting an arrest has been clearly established as a violation of the Fourth Amendment, Samarco's legal right cannot be so general as to allow him to "convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson*, 483 U.S. at 639, 107

S.Ct. at 3039; *see also Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir. 1987) ("General concepts have little to do with the concept of qualified immunity.").

 Deputy Christensen would confine the issue to whether there was clearly established law at the time of the incident that the use of police dogs to bite and hold felony suspects constituted excessive force. As a threshold matter, the use of a trained dog to apprehend fleeing or hiding felons is not inherently excessive force, though it is recognized that, even if a suspect immediately submits to the force after the initial contact with the dog, some injury to the suspect is likely to occur. *See Kerr*, 875 F.2d at 1550 (when police dogs are trained to bite and hold, injuries are often inevitable). Following Eleventh Circuit analysis, the use of Faero under the circumstances did not violate law which was clearly established on July 21, 1995.[4] *See id.*

 "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Kelly v. Curtis*, 21 F.3d 1544, 1550 (11th Cir.1994). If it is determined that "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of [Deputy Christensen's] conduct under the circumstances, summary judgment for [Christensen] is appropriate." *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1378 (11th Cir. 1997) (citation omitted). With these tenets in mind, examining the precise actions of Deputy Christensen and the precise information possessed by him, the Court concludes that a reasonable officer could not

4. Samarco has cited several cases from other jurisdictions to support his argument that the law regarding the use of canine force to effectuate an arrest of a hiding felon is clearly established as excessive. However, the varying views of courts in other jurisdictions has no bearing on the issue of what Deputy Christensen believed the law to be. The only courts relevant to the determination of clearly established law for qualified immunity purposes are decisions of the U.S. Supreme Court, the Eleventh Circuit Court of Appeals, and the Florida Supreme Court. *See Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 827 n. 4 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997) (Only the U.S. Supreme Court, the Eleventh Circuit, and "the highest court of the state where the case arose" may clearly establish rights under federal law relevant to qualified immunity analysis). The Court has not found any binding cases that decided the issue in the manner in which Samarco asks this Court to do.

have believed his actions were unlawful, in light of clearly established law.

The myriad case law interpreting the Fourth Amendment has staked no bright line for identifying force as excessive. *See, e.g., Connor,* 490 U.S. at 396, 109 S.Ct. at 1872. Unless a controlling and factually similar case declares Deputy Christensen's conduct unconstitutional, Samarco can overcome qualified immunity only by showing that the deputy's conduct lies at the very core of Fourth Amendment prohibitions, so that the unlawfulness of his conduct was readily apparent, notwithstanding the lack of case law. *See United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997).

It is well settled, and should be second nature to law enforcement officers, that a citizen's Fourth Amendment right against the use of excessive force is violated where the force used is unreasonable, when viewed in the totality of the circumstances. *See Connor,* 490 U.S. at 388–89, 109 S.Ct. at 1867–68. As previously discussed, excessive force claims are based on the reasonableness of the conduct from the objective perspective of a reasonable officer. *See id.* at 395, 109 S.Ct. at 1871. However, differentiating between permissible and forbidden force depends on the multiple factors established by the Supreme Court, and must be balanced on a fact intensive case-by-case basis. *See Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997). To reiterate, these factors include the severity of the crime for which Samarco was being sought, whether Samarco posed an immediate threat to the safety of Deputy Christensen and his fellow deputies, as well as to the residents in the housing complex, and whether Samarco was resisting or attempting to evade arrest. *See id.*

With respect to the first factor, when looked at in isolation, the severity of the crime—causing extensive property damage with his vehicle and throwing a rock—may initially appear to be somewhat minimal. However, information elicited from witnesses disclosed that Samarco had attempted to hit one of the witnesses with his truck and with the rock. Thus, Samarco was wanted for the felony of aggravated assault. Moreover, the deputies received radio transmissions that Samarco was known to carry knives and that he had a history of resisting arrest with violence and of being under the influence of narcotics. Samarco has not alleged that his criminal history was fabricated before being broadcasted to the deputies in the field, or that it was unknown to Deputy Christensen at the time Faero was used to search for and to seize him. In light of the serious nature of the charges, in conjunction with Samarco's history of violence and his exhibition of violent behavior on the date of his arrest, this factor weighs in favor of Deputy Christensen.

■■■ The weight of the other two *Connor* factors also favor Deputy Christensen. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using [even] deadly force." *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). Samarco hid in a residential backyard, had displayed erratic and violent behavior, and was suspected of being, and in fact was, armed. Moreover, Samarco had knocked on a resident's door and stated that he would not be taken to jail. These details, in the context of his prior history of violent resistance, inferred that the safety of the deputies and the residents of the area had to be considered. The Court finds no material fact question exists concerning the immediate threat posed by Samarco.

An edge must also go to Deputy Christensen on whether Samarco was actively resisting or attempting to evade arrest when he hid in the bushes and did not come out after a canine announcement. Samarco's stipulated facts concede that he fled upon seeing the deputies' vehicles at his house. He was also aware that he was the subject of an intense search, and ad-

mits that he heard the helicopter. He believed that if he could remain hidden, the effects of his crime would dissipate and the officers would call off the search.

Even assuming, as Samarco contends, that Deputy Christensen failed to give the warning announcement prior to releasing Faero to apprehend, the Court does not find that the law in this area was clearly established in July 1995 "in such a concrete and factually defined context to make it obvious to all reasonable government actors, in [Deputy Christensen's] place, that [releasing Faero without warning] violated federal law." *Lassiter*, 28 F.3d at 1149. Samarco has not cited any controlling authority which would establish that Deputy Christensen's failure to warn, if such was the case, was a clear violation of Samarco's constitutional rights. In fact, the case law existing at the time was contrary to Samarco's position. *See, e.g., Kerr*, 875 F.2d at 1553. "[I]f . . . there is probable cause to believe that [a suspect] has committed a crime involving the . . . threatened infliction of serious physical harm, [even] deadly force may be used if necessary to prevent escape, and if, *where feasible*, some warning has been given." *Id.* (quoting *Garner*, 471 U.S. at 11–12, 105 S.Ct. at 1701) (emphasis added); *see also Bolanos v. Bain*, 696 So.2d 478, 484–85 (Fla. 3d DCA 1997) ("a failure to warn [about the release of the dog] under these circumstances would not constitute a waiver of [the officer's] qualified immunity.").[5]

The Court is also unpersuaded by the argument that other, less forceful methods were available to seize Samarco. It is undisputed that Deputy Christensen was entitled to use some degree of force to apprehend Samarco. Use of forms other than Faero, such as pepper spray as Samarco suggests, would have required Deputy Christensen to be much closer to Samarco. Samarco also contends that he

could have been "gassed out of the bushes." However, this alternative appears equally unfeasible, since gas would also affect the deputy as well as Faero, and could have caused Samarco to bolt from the bushes in a threatening manner.

Finally, Samarco contends that the presence of other officers and the helicopter would have coerced Samarco to surrender. The record reflects at least three reasons why this method would have been ineffective. First, neither the other twelve deputies at the scene nor the helicopter pilot knew where Samarco had been hiding until Faero positively alerted to the bushes. Second, Samarco admitted that he had a pair of scissors and the officers were warned that Samarco was not amenable to capture and could be armed. Third, Samarco was aware that other officers and the helicopter were present, and still, he failed to surrender.

Because of the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation," the Court finds that Deputy Christensen's use of Faero to subdue and arrest Samarco passes constitutional muster. *See Connor*, 490 U.S. at 396, 109 S.Ct. at 1872. Moreover, the Court is not aware of any case holding that the use of a police dog is excessive and unreasonable force, at least where the suspect is hiding or fleeing.

Based on the unique factual circumstances in which Deputy Christensen acted, and the ample evidence in the record that he acted in good faith, pursuant to clearly established law and the information he possessed at the time, it is appropriate to determine, as a matter of law, that it was reasonable for Deputy Christensen to use Faero to seize Samarco. Since the use of Faero in this case, by an officer wishing

---

**5.** Although *Bolanos* was decided almost two years after Samarco's seizure and is not an opinion of the state's highest court, the incident took place in November 1990, and the

Third District Court of Appeal relied on established Eleventh Circuit case law existing at the time of Bolanos' arrest.

to prevent harm to himself and other deputies and residents in the area was objectively reasonable, Deputy Christensen is entitled to qualified immunity from liability. Accordingly, summary judgment in favor of Deputy Christensen in his individual capacity is justified.[6]

## IV. Conclusion

Courts addressing claims of excessive force must be mindful that law enforcement officers have a difficult and dangerous job. To fulfill their obligations to the community, officers must be given flexibility to pursue their duties and to make tough choices on a moment's notice without fear of a lawsuit based merely on hindsight. *See Garner*, 471 U.S. at 20, 105 S.Ct. at 1706. In *Garner*, the Supreme Court expressed hesitance "to declare a police practice of long standing 'unreasonable' if doing so would severely hamper effective law enforcement." *Id.* at 19, 105 S.Ct. at 1705.

Properly trained police dogs and their handlers serve an important purpose. Availability of this method of search and apprehension can limit an officer's resort to deadly forms of force, such as firearms. "The use of dogs can make it more likely that officers can apprehend suspects without the risks attendant to the use of firearms ..., thus, frequently enhancing the safety of the officers, bystanders and the suspect." *Robinette v. Barnes*, 854 F.2d 909, 914 (6th Cir.1988). In light of Supreme Court precedent, and the extensive use of dogs to facilitate law enforcement

goals, this Court is hesitant to declare this useful and long-standing practice unconstitutional.

Moreover, "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986). Even assuming no express limits were placed on the use of its canine units, since Samarco did not suffer a constitutional injury as a result of the canine policy promulgated by the Palm Beach County Sheriff's Office, the official capacity claims against Sheriff Neumann and Deputy Christensen cannot survive summary judgment.

Deputy Christensen is also entitled to qualified immunity. The law was not clearly established at the time of Samarco's apprehension such that a reasonable officer in Deputy Christensen's position would have known that his actions in deploying Faero to search for, locate, and seize a felony suspect who was intentionally evading arrest for almost two hours by hiding under bushes violated a clearly established right. Samarco has not alleged the type of circumstances involving the use of a police dog violative of clearly established law. *See, e.g., Kerr*, 875 F.2d at 1551–52, 1556–57 (describing incidents where use of dogs *involved excessive force against suspects of minor and nonviolent*

---

**6.** Samarco had previously alleged that Deputy Christensen encouraged and permitted Faero to continue to bite for fifteen minutes after Samarco had already been subdued. The Court agrees that it was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack could constitute excessive force that would be a constitutional violation. Yet, Samarco did not raise this issue in opposing the defendants' motions for summary judgment. Admittedly, such a claim, if true, is troubling. Had Faero, a German Shepard, continued to bite Samarco for fifteen minutes, his leg would most likely have been shredded.

Nevertheless, the Court finds that in addition to the improbability of Samarco's allegations regarding the duration of the contact, such an allegation is not supported by the transcript of the radio transmissions among the deputies, which reveals that at 10:26 a.m., Samarco had not yet been apprehended, and that by 10:31 a.m., medics had already been requested. Moreover, Samarco admitted in deposition testimony that he was unable to assess the amount of time that elapsed from contact to release. Accordingly, this issue is of no consequence to the disposition of the propriety of qualified immunity.

*crimes*). In this case, Deputy Christensen acted as a reasonable officer within the same circumstances. Samarco was suspected of a violent felony, had previously resisted arrest with violence, and was believed to be armed. It was well within the realm of reasonableness to use Faero to locate and seize Samarco, considered a physical threat to the deputies and the immediate community.

The issue of qualified immunity is a legal question for the Court, which must be decided as early as possible in the case. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Its application is the rule, not the exception. *See Lassiter,* 28 F.3d at 1149. Samarco failed to convince the Court that his claim against Deputy Christensen in his individual capacity represents the exceptional case where qualified immunity should not apply. There being no genuine issue of material fact remaining with regard to this claim, summary judgment is proper.

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment on Samarco's § 1983 official capacity claims [D.E. # 70] is GRANTED. It is further

· **ORDERED AND ADJUDGED** that Defendant Randy Christensen's Motion for Summary Judgment on Samarco's § 1983 individual capacity claim [D.E. # 78] is GRANTED.